NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4226-14T3

JOHN PAFF,

    Plaintiff-Respondent,

v.

OCEAN COUNTY PROSECUTOR'S OFFICE,

    Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**June 30, 2016**

**APPELLATE DIVISION**

Argued February 3, 2016 — Decided June 30, 2016

Before Judges Fuentes, Kennedy, and Gilson
(Judge Gilson dissenting).

On appeal from Superior Court of New Jersey,
Law Division, Ocean County, Docket No.
L-1645-14.

Samuel Marzarella, Supervising Assistant
Prosecutor, argued the cause for appellant
(Joseph D. Coronato, Ocean County
Prosecutor, attorney; Mr. Marzarella and
Nicholas D. Norcia, Assistant Prosecutor, on
the brief).

Richard M. Gutman argued the cause for
respondent.

Annmarie Cozzi, Bergen County Senior
Assistant Prosecutor, argued the cause for
amicus curiae County Prosecutors Association
of New Jersey (Sean F. Dalton, President,
attorney; Ms. Cozzi, of counsel and on the
brief).

Alexander Shalom argued the cause for amicus
curiae American Civil Liberties Union of New

Jersey Foundation (American Civil Liberties Union of New Jersey Foundation, attorneys; Edward L. Barocas, Iris Bromberg, Jeanne LoCicero, and Mr. Shalom, on the brief).

Ian C. Kennedy, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (John J. Hoffman, Acting Attorney General, attorney; Mr. Kennedy, of counsel and on the brief).

The opinion of the court was delivered by

KENNEDY, J.A.D.

This appeal concerns the public's right to access recordings from the mobile video recorders (MVRs) in police vehicles under the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, and the common law. Plaintiff, John Paff, filed a verified complaint and an order to show cause seeking MVR recordings of an incident involving a Tuckerton Borough police officer's arrest of a driver for eluding and motor vehicle offenses. Judge Vincent Grasso ordered the recordings to be disclosed pursuant to OPRA, holding that they were government records, which were neither exempt as a "criminal investigatory record," N.J.S.A. 47:1A-1.1, nor excepted as part of an "investigation in progress," N.J.S.A. 47:1A-3(a). He also held that the driver's "expectation of privacy" did not justify withholding the recordings and, later, entered an order awarding plaintiff counsel fees and costs.

Defendant, Ocean County Prosecutor's Office (OCPO), and amici, the New Jersey Attorney General (Attorney General) and the County Prosecutors Association of New Jersey (Prosecutors Association), urge reversal. Amicus American Civil Liberties Union of New Jersey (ACLU) joins with plaintiff in arguing for an affirmance. Having reviewed the record and applicable law, we affirm.

I.

The facts that follow are drawn from the limited record developed before the Law Division on the order to show cause, which consists of various certifications submitted by the parties. The MVR recordings were made by dashboard cameras on Barnegat Township police vehicles during a motor vehicle stop on January 29, 2014.

On that date, a Tuckerton Borough police officer patrolling in a marked vehicle activated his overhead lights to effectuate a motor vehicle stop. The driver, however, did not stop and a motor vehicle chase ensued. As the vehicle headed toward Barnegat Township, police there were alerted. Two Barnegat Township police vehicles joined the chase, with their MVRs recording the fleeing vehicle, its subsequent stop in a municipal parking lot in Barnegat Township, and the driver's arrest. The MVRs of the two Barnegat police vehicles captured

audio and video of the Tuckerton police officer and his police dog during the arrest of the driver.

Following her arrest, the driver was charged with eluding, N.J.S.A. 2C:29-2(b), resisting arrest, N.J.S.A. 2C:29-2(a), and various motor vehicle offenses. The Tuckerton police officer who initiated the stop was later the subject of an internal affairs investigation, and he was charged in April 2014 with second-degree official misconduct, N.J.S.A. 2C:30-2, third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), and other offenses arising from his use of the police dog during the arrest. In January 2015, an Ocean County grand jury returned an indictment against the officer.

The incident was the subject of news reports, and, on May 20, 2014, plaintiff, a New Jersey resident who operates a website focused on public affairs, sent written requests to the OCPO and Barnegat Township for copies of "the video of this incident" and any summonses issued to the driver. Plaintiff cited both OPRA and the common law as authority for his requests.

The OCPO denied plaintiff's requests in a letter dated May 28, 2014, asserting that the records were exempt as part of a "criminal investigation in progress" and "an internal affairs matter." Later, however, that office gave plaintiff copies of

the criminal complaint and motor vehicle summonses issued to the driver, but declined to release the MVR recordings, citing the "active criminal investigation" exemption.

Plaintiff filed a verified complaint and an order to show cause seeking the MVR recordings under OPRA and the common law. Thereafter, the parties submitted briefs and certifications supporting their positions with respect to the release of the MVR recordings. The driver, who was not a party to the action, wrote to the OCPO objecting to the release of the recordings, citing privacy concerns.

In a certification dated July 1, 2014, John Halliday, a detective with the OCPO, stated that the MVR recordings "pertain to two ongoing, active criminal investigations — that of the police officer involved, as well as the victim who eluded police." He added that both the OCPO and the Tuckerton Borough Police Department are conducting "separate internal affairs investigations" arising from the events of January 29, 2014.

Halliday further stated in a second certification dated September 2, 2014, that "while not every police department" in the State uses MVRs, "when these videos are produced they are the work product of the police officer who operates the dash cam." This statement was followed by an assertion that disclosure of the video recordings would "compromise ongoing

criminal and internal affairs investigations and jeopardize any further developments in these investigations."

Jeffrey Ryan, a sergeant in the Barnegat Township Police Department, also submitted a certification, in which he identified himself as the individual responsible for "training officers in the use of [MVR] equipment." He supplied a copy of the "general order" governing the use of MVRs first issued by the Barnegat Police Chief in March 2008 and revised on January 9, 2014. Therein, the chief announced that:

> It is the policy of this agency to use mobile video recorders in order to protect the members of this agency and to record information related to motorist contacts and other patrol related activities. In addition, the equipment will provide valuable instructional material to be used in in-service training. While evidence may be captured on the recordings, the use of video and audio recording equipment by members of the patrol division in the performance of their duties is not intended as a device to document all evidentiary material relative to future court proceedings. Any evidence obtained is a by-product of the primary purpose for the installation of mobile video recording equipment.

> . . . .

> The record function of the MVR equipment is automatically initiated when the patrol vehicle's emergency lights are activated or the wireless microphone is turned on. Whenever the video recording has been activated officers shall ensure that the audio portion is also activated.

Section I of the general order sets forth the "pre-operational procedure" for the use of MVRs in patrol vehicles required in Barnegat Township, and it explicitly provides, "[a]ll officers assigned to the patrol division shall receive training in the use and operation of the MVR."

Section II of the order explains in detail the procedures required for using the MVRs, and subsections B and C set forth the circumstances in which recordings are mandatory. Because both of these subsections are pertinent to our opinion, we quote them both at length herein:

> B. Recording Incidents.
>
> The record function of the MVR equipment is automatically initiated when the patrol vehicle's emergency lights are activated or the wireless microphone is turned on. Whenever the video recording has been activated officers shall ensure that the audio portion is also activated.
>
> Whenever the emergency lights are activated officers shall not deactivate the recording function of the MVR equipment except for dismounted posts or traffic details.
>
> An officer may manually activate the system at his/her discretion. This allows a recording to be made without alerting a potential violator as a result of activating the emergency lights.
>
> When the recording function is activated to document any incident or MV stop, the unit will not be deactivated until such time as the incident has been completed

or the detained vehicle has been released and the officer has called back in service.

When a recording function has documented an event that is a major criminal incident involving serious injury, loss of life, or catastrophic property damage, neither the officer(s) involved, nor the personnel recording the incident will deactivate the MVR. Investigative Division personnel or a Division Commander will deactivate the MVR only when the event has ceased.

When a recording function has documented a police involved shooting or use of force by an officer(s) that results in the serious bodily injury or death of another person, the MVR will only be deactivated at the direction of the officer in charge of Professional Standards. Such deactivation approval will be documented in the CAD incident log.

Notwithstanding any other provision of this order, when an officer is involved in a major criminal incident, is present at a major crime scene, or both, a supervisor may authorize the deactivation of the audio portion of the MVR only when and if the supervisor determines that the incident has ceased and that it is no longer necessary to properly document the incident.

When an officer is requested to provide information regarding an event that has been captured on MVR equipment, the officer shall be made aware of the existence of the MVR and shall be given an opportunity to review the recording prior to any statements.

C. Types of Incidents to Record— Officers using MVR equipped vehicles shall record the following situations:

A-4226-14T3

All traffic stops, criminal enforcement stops, motorist aid situations, motor vehicle collisions, and pedestrian contacts in their entirety.

The MVR will be activated prior to the initiation of the stop or detention and prior to the officer contacting communications to advise of the stop or detention, unless it is unsafe or impracticable.

If an officer fails to activate the MVR prior to the contact, the reason will be indicated in detail in the associated CFS entry.

Whenever standardized field sobriety tests are conducted during a motor vehicle stop, the officer should when practicable adjust the MVR so as to allow for a visual record of the tests.

At no time should the standardized field sobriety tests be conducted in the area immediately in front of the patrol vehicle.

Police pursuits as defined by department policy.

Major crime scenes.

Situations which arise wherein the officer by reason of training or experience determines that the incident should be recorded.

Any special operation that should be documented.

The order also establishes review procedures for MVR recordings and, essentially, provides that recordings may be reviewed to

assess the performance of the officer, his need for further training, or his satisfactory performance of his duties.

As Sergeant Ryan set forth in his certification, the "recording" function of the MVR in a patrol vehicle is "automatically initiated when the patrol vehicle's lights are activated." Also, when an MVR has recorded the "use of force by an officer that results in the serious bodily injury or death of another person," it shall "only be deactivated at the direction of the officer in charge of Professional Standards."

Following oral argument, Judge Grasso issued written opinions on July 31 and October 2, 2014. In his July 31 opinion, the judge concluded that the MVR recordings were government records, but, at that point in the proceeding, the OCPO had failed to carry its burden to produce specific, reliable evidence establishing that the recordings were exempt from disclosure as "criminal investigatory records" under N.J.S.A. 47:1A-1.1. See Courier News v. Hunterdon Cty. Prosecutor's Office, 358 N.J. Super. 373, 382—83 (App. Div. 2003).

Moreover, Judge Grasso held that the recordings were not exempt from disclosure as pertaining to an "investigation in progress," N.J.S.A. 47:1A-3(a), because any investigations of the driver of the vehicle or the officer "began after the video

was made." The judge explained that under the specific terms of N.J.S.A. 47:1A-3(a), "the ongoing investigation exception does not work retroactively to render public documents confidential once an investigation begins." He then held that the traffic stop, having been made at 11:00 a.m. in a public parking lot, did not entitle the driver to a "reasonable expectation of privacy in the video."

Judge Grasso concluded his opinion by adjourning the case until September 2014 to permit the OCPO to submit "supplemental briefs, certifications and evidence" on whether the MVR recordings were exempt under N.J.S.A. 47:1A-1.1 as a "criminal investigatory record."

On October 2, 2014, Judge Grasso issued his second opinion, following receipt of additional briefs and certifications from the parties, as well as conducting an in camera review of the MVR recordings. In that opinion, he decided that because the Barnegat Police Chief had issued a standing order requiring the use of MVRs during motor vehicle stops, and at such times as the patrol officers had activated their overhead lights, the recordings were required by law to be made and maintained and, thus, were not "criminal investigatory records" as defined under N.J.S.A. 47:1A-1.1.

Citing O'Shea v. Twp. of W. Milford, 410 N.J. Super. 371, 383—84 (App. Div. 2009), Judge Grasso determined that the "binding and enforceable" nature of the general order issued by the Barnegat Police Chief, carried with it the "force of law" for the making and maintaining of MVR recordings in municipal patrol vehicles. He explained that the general order had been issued in accordance with the delegation of power provided by the Legislature under N.J.S.A 40A:14-118.

Further, Judge Grasso rejected the argument that the Attorney General's Guidelines on Internal Affairs Policies and Procedures exempted the recordings from disclosure, reasoning that the recordings were made before and not as part of the internal affairs investigation. After reviewing the MVR recordings in camera, he also determined that the driver did not have a reasonable expectation of privacy that might otherwise justify withholding public access. The judge explained that the stop took place in a public area, and the recordings did not disclose anything of a highly personal nature.

Finally, Judge Grasso found no basis to deny access to the recordings because the OCPO had not yet released the MVR recordings as part of its criminal discovery. Because he determined that the MVR recordings were accessible under OPRA,

the judge did not reach the question whether the recordings would have to be disclosed under the common law.

Subsequently, Judge Grasso entered an order memorializing his October 2 decision, granting judgment in favor of plaintiff on his OPRA claim, directing the OCPO to grant access to the MVR recordings, and dismissing the common law count as moot. After reviewing a fee application, the judge awarded plaintiff $27,560 in attorney's fees and costs.

This appeal followed.

## II.

On appeal, the OCPO makes nine arguments: (1) the OPRA burden of proof does not apply to the MVR recordings; (2) the MVR recordings are criminal investigatory records and, thus, not government records; (3) even if the records are government records, they are exempt from disclosure under executive orders issued by Governor Whitman; (4) the records are exempt from disclosure as an investigation in progress; (5) the records are exempt as discovery materials; (6) the records are exempt under privacy provisions of OPRA; (7) the records should not be disclosed under the common law; (8) plaintiff was not entitled to an attorney's fee award; and (9) the trial judge committed error in awarding attorney's fees. The Attorney General and the

Prosecutors Association join in arguments two, four, six, and seven.

A.

We review a trial judge's legal conclusions concerning access to public records under OPRA de novo. <u>Drinker Biddle & Reath, LLP v. N.J. Dep't of Law and Pub. Safety</u>, 421 <u>N.J. Super.</u> 489, 497 (App. Div. 2011). We will not disturb factual findings as long as they are supported by adequate, substantial, and credible evidence. <u>See Meshinsky v. Nichols Yacht Sales, Inc.</u>, 110 <u>N.J.</u> 464, 475 (1988). If a court conducts an <u>in</u> <u>camera</u> review of documents and engages in a balancing of interests in connection with a common-law-based request to inspect public records, we apply a more deferential standard of review. <u>Shuttleworth v. City of Camden</u>, 258 <u>N.J. Super.</u> 573, 588 (App. Div.), <u>certif.</u> <u>denied</u>, 133 <u>N.J.</u> 429 (1992). Nevertheless, "to the extent [the appellate court] can be said to be reviewing essentially a legal determination, [it] can review the documents which the trial judge ordered disclosed." <u>Ibid.</u>

New Jersey has traditionally maintained a strong public policy that "government records shall be readily accessible for inspection, copying, or examination by the citizens of this State." <u>N.J.S.A.</u> 47:1A-1. The OPRA statute ensures, with exceptions, that "all government records shall be subject to

14

public access."  Ibid.  A person who is denied access to a government record may challenge the denial in Superior Court. N.J.S.A. 47:1A-6.  In OPRA cases, the records custodian has the burden to show that its denial of access was authorized by law. See Asbury Park Press v. Monmouth Cty., 406 N.J. Super. 1, 7 (App. Div. 2009) (citing N.J.S.A. 47:1A-6), aff'd, 201 N.J. 5 (2010).

The threshold question in an OPRA claim is whether the plaintiff has requested "government records" pursuant to the statute.  O'Shea, supra, 410 N.J. Super. at 380 (citation omitted).  The statute broadly defines a "government record" as:

> [A]ny paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document, information stored or maintained electronically or by sound-recording or in a similar device, or any copy thereof, that has been made, maintained or kept on file in the course of his or its official business by any officer, commission, agency or authority of the State or of any political subdivision thereof . . . .
>
> [N.J.S.A. 47:1A-1.1.]

Clearly, then, the MVR recordings at issue in this case fit within this broad definition and thus are presumptively "subject to public access" unless they are expressly exempted from disclosure.

In deciding whether the records in this case are exempt from disclosure, we first address the burden of proof arguments raised by the OCPO.  We then address the "criminal investigatory records" exemption, as well as the "investigation in progress" exception.  We concur with Judge Grasso's well-reasoned opinions rejecting the "criminal investigatory record" exemption set forth in OPRA, as applied to the facts of this case, as well as the "investigation in progress" exception, and, therefore, we affirm the judgment of the Law Division.  We also address other OPRA provisions raised by the OCPO and amici, and we conclude that they do not apply to the facts herein.  Finally, we reject the remaining arguments on appeal as without sufficient merit to warrant discussion in a written opinion.

B.

As we noted earlier, "OPRA provides for ready access to government records by the citizens of this State."  Burnett v. Cty. of Bergen, 198 N.J. 408, 421–22 (2009) (citing Mason v. City of Hoboken, 196 N.J. 51, 64–65 (2008)).  "The purpose of OPRA is to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process."  Times of Trenton Publ'g Corp. v. Lafayette Yard Cmty. Dev. Corp., 183 N.J. 519, 535 (2005) (quoting Asbury Park Press v. Ocean Cty. Prosecutor's Office,

16

374 N.J. Super. 312, 329 (Law Div. 2004)). Accordingly, OPRA directs that "all government records shall be subject to public access unless exempt," and that "any limitations on the right of access . . . shall be construed in favor of the public's right of access." N.J.S.A. 47:1A-1. "Consistent with those aims, the statute broadly defines government records to include documents made, maintained or kept in the course of official government business, but exempts twenty-one categories of information from the definition." Burnett, supra, 198 N.J. at 422 (citing N.J.S.A. 47:1A-1.1).

OPRA places on the custodian of the records "the burden of proving that the denial of access is authorized by law." N.J.S.A. 47:1A-6. Specifically, OPRA states that "[a] person who is denied access to a government record . . . may: institute a proceeding to challenge the custodian's decision by filing an action in Superior Court . . . [and t]he public agency shall have the burden of proving that the denial of access is authorized by law." Ibid.

Here, the OCPO argues that when the records fall within a statutory exemption under OPRA, the public agency must make only a facial showing, and then the burden shifts to the requester. We reject this argument because it is inconsistent with the statute and existing case law.

A-4226-14T3

OPRA unequivocally states that "[t]he public agency shall have the burden of proving that the denial of access is authorized by law." N.J.S.A. 47:1A-6. Consistent with the plain language of OPRA, the burden of proof is on the government entity seeking to deny access. See, e.g., O'Shea, supra, 410 N.J. Super. at 380—81 (acknowledging that the government agency has the burden even when asserting that the "criminal investigatory record" exemption applies); Courier News supra, 358 N.J. Super. at 382-83 ("Under OPRA, a public agency seeking to restrict the public's right of access to government records must produce specific reliable evidence sufficient to meet a statutorily recognized basis for confidentiality.").

The OCPO argues that two cases stand for the proposition that the public agency need only make a facial showing, and that the burden then shifts to the party seeking access. See Educ. Law Ctr. v. N.J. Dep't of Educ., 198 N.J. 274, 286—87 (2009), and Michelson v. Wyatt, 379 N.J. Super. 611, 621 (App. Div. 2005). However, we find that neither of these cases stand for the proposition advanced by the OCPO.

In Education Law Center, the Supreme Court discussed a qualified privilege and explained that after the governmental agency had carried its burden of proof to establish the privilege, the requester could make a further showing that might

overcome the public agency's assertion of the privilege. Educ. Law Ctr., supra, 198 N.J. at 287 (discussing the deliberative process privilege). In Michelson, the plaintiff sought medical coverage information for every municipal employee, as well as their claims histories — records, unlike those at issue here, clearly not subject to OPRA disclosure. Michelson, supra, 379 N.J. Super. at 615; N.J.S.A. 47:1A-10. We held that "when the requested material appears on its face to encompass legislatively recognized confidentiality concerns, a court should presume that the release of the government record is not in the public interest." Id. at 621 (emphasis added). Accordingly, we reject the argument advanced by the OCPO.[1]

## C.

The OCPO, the Attorney General, and the Prosecutors Association argue that the MVR recordings in this case are excluded from OPRA under the "criminal investigatory record" and "investigation in progress" exemptions. Plaintiff and the ACLU contend that the OCPO failed to carry its burden of proving either of these exclusions, and the MVR recordings are government records to which the public has a right of access

---

[1] Additionally, the argument, even if it had any basis in the law, begs the question because it assumes that the MVR recordings are clearly exempted from disclosure under OPRA. Obviously, the recordings are not clearly exempt under the statute given our analysis.

under OPRA. While these two exclusions overlap as applied to criminal investigations, they are distinct, and we will evaluate them separately.

### 1. The Criminal Investigatory Records Exemption

As we explained above, OPRA broadly defines a government record to include any document, photograph, or image "made, maintained or kept" by, among others, a municipality in the course of its official business. N.J.S.A. 47:1A-1.1. It then declares, however, that "[a] government record shall not include" various categories of "information which [are] deemed to be confidential." Ibid. One such category is a "criminal investigatory record," defined as "a record which is not required by law to be made, maintained or kept on file that is held by a law enforcement agency which pertains to any criminal investigation or related civil enforcement proceeding." Ibid. Thus, to prove that a record is a criminal investigatory record, the public agency must show that the record: (1) is not required by law to be made and (2) pertains to a criminal investigation or related civil enforcement proceeding. O'Shea, supra, 410 N.J. Super. at 380—81.

We have addressed the "criminal investigatory record" exemption in two cases that have reached different conclusions regarding the first element in the definition of a criminal

investigatory record; that is, the record "is not required by law to be made, maintained, or kept . . . by a law enforcement agency."  See N. Jersey Media Grp. v. Twp. of Lyndhurst, 441 N.J. Super. 70, 95–96 (App. Div.), leave to appeal granted, 223 N.J. 553 (2015), and O'Shea, supra, 410 N.J. Super. at 381 (quoting N.J.S.A. 47:1A-1.1).  We shall examine these cases to determine if they are reconcilable, and we will then review the record in light of our conclusions respecting the scope of this phrase.

In undertaking this task, we are mindful that "our goal is to interpret the statute consistent with the intent of the Legislature." Oberhand v. Dir., Div. of Taxation, 193 N.J. 558, 568 (2008).  Applying well-settled rules of statutory construction, "we give a statute's words and phrases their usual and ordinary meaning, N.J.S.A. 1:1-1, because the words of a statute ordinarily provide the most reliable indication of legislative intent." Cty. of Bergen Emp. Benefit Plan v. Horizon Blue Cross Blue Shield of N.J., 412 N.J. Super. 126, 132 (App. Div. 2010).  "When the language in a statute is clear and unambiguous, and susceptible to only one interpretation," we presume the Legislature meant what it said and that the plain meaning governs. Burnett, supra, 198 N.J. at 421.

We are also guided by the statutory command that OPRA "shall be construed in favor of the public's right of access." Fair Share Hous. Ctr., Inc. v. N.J. State League of Municips., 207 N.J. 489, 501 (2011) (quoting N.J.S.A. 47:1A-1). Where the statute is unclear, the Court has resolved any ambiguities in a manner consistent with its broad purpose. Id. at 502; Sussex Commons Assocs. v. Rutgers, 210 N.J. 531, 540—41 (2012).

We remain mindful that "OPRA's clear purpose . . . is to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process." Educ. Law Ctr., supra, 198 N.J. at 284 (citation omitted). "OPRA's promise of accessible public records enables citizens and the media [to] play a watchful role in curbing wasteful government spending and guarding against corruption and misconduct." Sussex Commons, supra, 210 N.J. at 541 (alteration in original) (citation omitted).

In O'Shea, we affirmed the trial court's order requiring the municipality to provide access to the "use of force reports" (UFRs) from its police department. O'Shea, supra, 410 N.J. Super. at 388. We rejected the defendant's argument that the UFRs were exempt from disclosure as "criminal investigatory records" under N.J.S.A. 47:1A-1.1, or that they were shielded from disclosure as records pertaining to "an investigation in

22

progress" by a public agency under N.J.S.A. 47:1A-3(a). Id. at 384—86.

In addition, we found that the Attorney General's Use of Force Policy requiring the completion of UFRs by local police departments, issued pursuant to N.J.S.A. 52:17B-98, had the force of law. Id. at 384. Accordingly, we held that the UFRs were not criminal investigatory records and were not exempt from access under OPRA. Id. at 385—86.

In so holding, we rejected the argument that case law decided under OPRA's predecessor statute, the Right-to-Know Law (RTKL), L. 1963, c. 73, repealed by OPRA, L. 2001, c. 404, provided guidance on interpreting OPRA's definition of government records and exemptions to that definition. Id. at 381. We explained that the RTKL "strictly defined" the phrase, "required by law," and was repealed expressly because it was "less encompassing" in allowing public access to records than the public policy of New Jersey required. Ibid.

Now, OPRA expresses this State's public policy favoring transparency in government and disclosure of government documents. N.J.S.A. 47:1A-1. The statute endeavors "to maximize public knowledge about public affairs." Times of Trenton, supra, 183 N.J. at 535 (citation omitted).

Accordingly, our rejection of the OCPO's arguments was consistent with both the letter and the purpose of the statute.

In North Jersey Media Group, another panel of the appellate division rejected O'Shea's position and concluded that "it is appropriate to interpret the criminal investigatory records exception in OPRA" by looking at "pre-OPRA case law interpreting the RTKL's 'required by law' standard in cases involving requests for records pertaining to criminal investigations." N. Jersey Media Grp., supra, 441 N.J. Super. at 96 (expressly disagreeing with that portion of O'Shea that held the RTKL was inapplicable).

That case involved an OPRA request seeking extensive records from local, county, and state law enforcement agencies concerning a fatal police shooting of a criminal suspect. Id. at 81—82. Among the records sought therein were police MVR recordings. Ibid. Writing for the court, Judge Ostrer explained that a record is "required by law to be made" if its creation is "mandated by a statute, regulation, executive order, or judicial decision." Id. at 97. Thus, the court held that a record subject to "a generic record retention policy, or an internal agency directive of a public official" is not one that is required to be made by law. Ibid.

While there is much in <u>North Jersey Media Group</u> with which we agree, and we laud Judge Ostrer's impressive exegesis concerning OPRA's legislative history, we find it unnecessary at this point to engage in a detailed dissection of the many issues that the opinion dealt with because we disagree with three of the conclusions that our colleagues drew from their examination of the facts and the legislative history of OPRA.

First, we disagree with the conclusion that the floor amendment proposed by Senator Martin to Assembly Bill 1309, which was adopted as part of the OPRA statute "restored, with respect to criminal investigatory records, the RTKL's 'required by law' standard," <u>Id.</u> at 95, and thereby justified a narrow interpretation of the phrase. Indeed, at a hearing before the Senate Judiciary Committee on March 9, 2000, respecting public access to government records, Senator Martin remarked:

> The problem with the [RTKL] is that it only requires . . . documents that are required by law to be made public . . . . The statute, in other words, is very narrow in its form. And what has happened is that many records, which the public, I think, would expect to be made available to them, are not required to be made . . . . And so it creates an enormous loophole . . . .
>
> . . . I fundamentally believe that the public is entitled to the records of its government . . . .
>
> [<u>Issues dealing with public access to government records</u>: Hearing on S. 161, 351,

573, and 866 Before the S. Judiciary Comm., 2000 Leg., 209th Sess. 1-2 (N.J. 2000) (statement of Sen. Robert J. Martin, Member, S. Comm. on RTKL precluding certain documents from public access).]

Given this statement, the legislative history of the statute, and OPRA's express mandate that it must be construed in favor of public access, N.J.S.A. 47:1A-1, it is anomalous to suggest that the phrase "required by law" nonetheless must be interpreted to broaden the scope of documents concealed from public view. See N. Jersey Media Grp., supra, 441 N.J. Super. at 96—97.

Second, we disagree with the conclusion that the issuance of a directive by the Attorney General, like that considered in O'Shea, which required local police departments to prepare and complete UFRs, are merely "internal agency directives on record retention or creation" not within the meaning of "required by law" under OPRA. Id. at 97. The Attorney General's directive is not a prescription for the mechanism of storage or retrieval of documents; rather, it is a clear expression of policy pertaining to citizen encounters with members of law enforcement agencies.

An Attorney General directive that is binding upon a local police department which requires the recordation and memorialization of incidents where the police have employed physical force against a citizen is not, in our view, an example

of a "generic record retention policy." Further, the suggestion that by recognizing such Attorney General directives as "required by law" gives rise to an anomaly in that an agency may thereby "both require the making of a document, and exempt it from access," id. at 103, is simply puzzling and, in any event, not a persuasive reason for allowing a governmental agency to hide the reports.

Third, we disagree with the suggestion that an officer's decision to activate an MVR to document a traffic stop or pursuit of a suspected criminal violation of the law may make the recording "pertain to a criminal investigation, albeit in its earliest stages." Id. at 105. Such a broad suggestion implies too much, in our view; would be factually inaccurate in most instances; and certainly is not true where, as here, the MVR automatically starts when the officer simply activates his overhead lights.

Accordingly, we part ways with the holding of North Jersey Media Group, and we are persuaded that the rationale we employed in O'Shea is more consistent with the legislative intent expressed in OPRA. We return now to a consideration of the matter at hand.

Here, the Law Division held that the MVR recordings were not "criminal investigatory records" because the recordings were, in

fact, "required by law" to be made.  In reaching that conclusion, the judge reasoned that the order of the Barnegat Township Police Chief, requiring all officers to activate MVRs when making a traffic or law enforcement stop, was authorized by statute and unequivocally binding upon the police officers within the department, and thus had the force of law.  We agree.

When the facts of this case are examined, whether one employs the rationale of O'Shea or considers the Legislature's intent as revealed in the legislative history and the plain language of OPRA, the MVR recordings were clearly required by law to be made.  A record required by a local law enforcement order, issued pursuant to the delegation of power provided by N.J.S.A. 40A:14-118, is the equivalent of a record required by law.

While O'Shea dealt with an Attorney General directive that applied statewide, 410 N.J. Super. at 382 (citing N.J.S.A. 52:17B-97 to -117; In re Gen. Discip. Hearing of Carberry, 114 N.J. 574, 577—78 (1989); In re Carroll, 339 N.J. Super. 429, 439 (App. Div.), certif. denied, 170 N.J. 85 (2001)), and here we consider an order issued by the police chief of one municipality, such distinction does not warrant a different result. That is, in our view, a distinction without a difference.  The chief had the statutory authority to issue the order, and it is clearly binding and enforceable on the members

of the department.  We do not consider that simply because the order does not have statewide application, it is not "required by law."[2]

Our dissenting colleague concludes that the chief's order does not constitute a "law" because it does not have "statewide application" and was "only issued by a local police chief."  In reaching this conclusion, our colleague apparently adopts the rationale of North Jersey Media Group that a record is "required by law" only if it is "mandated by a statute, regulation, executive order or judicial decision" that applies statewide. N. Jersey Media Grp., supra, 441 N.J. Super. at 97.

At the outset, we point out that our conclusions are rooted in the record created by the OCPO to justify its decision to refuse release of the MVR recordings.  Our holding is that the OCPO did not meet its burden of proof to show that an exemption to disclosure applies under OPRA.  The failure of proof is thus a critical part of our holding herein, which our dissenting colleague does not address.

Our research discloses that the phrase "required by law" is contained within 435 statutes, and has been employed over 700

_____

[2] We note that further guidance on the scope of the "criminal investigatory records" exemption to OPRA may be provided because our Supreme Court has granted leave to appeal in North Jersey Media Group.  See N. Jersey Media Grp. v. Twp. Of Lyndhurst, 223 N.J. 553 (2015).

times by the Supreme Court and the Superior Court in reported decisions. The very ubiquity of the phrase makes it impossible to ascribe a precise definition to the word "law," and therefore we must derive its meaning from the "context in which it was employed." Seatrain Lines, Inc. v. Medina, 39 N.J. 222, 230 (1963).[3]

Unlike our colleagues in North Jersey Media Group, and our dissenting colleague here, we perceive no reason to support the conclusion that the intent of the Legislature in enacting OPRA would have restricted the phrase to statutes or regulations with statewide application. Our understanding is that the Legislature wished to shield from disclosure those materials reflecting the professional judgments and efforts of investigators and others employed within the context of a criminal investigation where such disclosure would compromise their efforts or endanger witnesses or others identified therein. Cf. Irval Realty Inc. v. Bd. of Pub. Util. Comm'rs, 61 N.J. 366 (1972). However, the Legislature manifestly did not intend to exclude from disclosure those materials that must be

---

[3] Our dissenting colleague notes that "law" is "generally understood to include duly enacted statutes, ordinances, [and] regulations . . . ." Nonetheless, a municipal ordinance, of course, cannot have "statewide application," and, therefore, could not have been what the "Legislature had in mind" in employing the word here, our colleague concludes without explanation.

generated in accordance with established authority and, consequently, would not reflect the professional judgments and discretionary efforts of law enforcement officers.

Given the context in which the phrase "required by law" is employed by OPRA, the MVR recordings — which, in accordance with the chief's highly detailed order, are generated automatically whenever an officer activates the overhead lights in the police vehicle - fall within the latter category. We need no further explanation, lest we needlessly repeat our earlier conclusions.

Judge Grasso did not address the second component of the criminal investigatory record exemption; that is, whether the MVR recordings pertained to a criminal investigation. Given the sparse record created by the OCPO in support of its election to deny public access to the MVR recordings, there is little to commend a remand to the Law Division for further consideration of that issue. The burden of proof on this issue, as we have explained, was the OCPO's obligation. The unexplained, conclusory statements of Detective Halliday do not constitute "specific reliable evidence" justifying the conclusion that these records "pertain" to a criminal investigation, thereby mandating their exemption from disclosure. Courier News, supra, 358 N.J. Super. at 382—83. Thus, the OCPO failed to carry its burden on this issue.

Addressing MVR recordings, as we noted earlier, our colleagues in North Jersey Media Group reasoned, "when an officer turns on [an MVR] to document a traffic stop or pursuit of a suspected criminal violation of law, that recording may pertain to a criminal investigation, albeit in its earliest stages." N. Jersey Media Grp., supra, 441 N.J. Super. at 104—05. Nonetheless, that case did not address the facts that obtain here: the automatic activation of the MVR whenever the patrol vehicle switched on its overhead lights. Accordingly, we cannot conclude on this record that the Barnegat officers were investigating anything when the lights were activated.

In O'Shea, Judge Kestin, writing for the court, reasoned:

> In the absence of a factual showing that any of the reports sought in this matter pertained to an actual criminal investigation or to an existing related civil enforcement proceeding, we decline to adopt the position urged by defendant that UFRs should, generically, be regarded to be shielded from public access as records [pertaining to an investigation].
>
> [O'Shea, supra, 410 N.J. Super. at 385.]

The certifications of Detective Halliday stated, in conclusory fashion, that the "video recording pertains to two ongoing, active criminal investigations . . . . The video also pertains to two separate internal affairs investigations of [the Tuckerton police officer] . . . ." These bald statements, as we

have noted, are hardly the type of evidence which would compel our adoption of their conclusions.

The existing record makes clear that the MVR recordings were made before there was any contemplation of a criminal investigation concerning the Tuckerton police officer. Further, given the mandate of the general order of the Barnegat Police Chief, it is abundantly clear that the MVR recordings were not initiated as part of an investigation into a suspected eluding, but rather the recordings commenced simply because the Barnegat officers activated their overhead lights.

The Attorney General suggests that this record allows us to reach the opposite conclusion inferentially because the incident began with a vehicle failing to stop in Tuckerton Borough, and the Barnegat police were notified when the vehicle was being pursued. This, indeed, is the conclusion reached by our dissenting colleague. We reject that conclusion, however, given the OCPO's utter failure to adduce any evidence in the Law Division that the officers here departed in any way from the mandate of the general order. Moreover, the purpose of the MVR recordings, as explained by the police chief in the general order, militates against this conclusion. Therein, the chief explained that the recordings are primarily intended to protect the officers in the discharge of their official duties and serve

as a training device, rather than fulfill an investigatory or evidentiary function.

### 2. The Investigation in Progress Exception

The "investigation in progress" exception to OPRA is defined in N.J.S.A. 47:1A-3 and provides that:

> Notwithstanding the provisions of [OPRA], where it shall appear that the record or records which are sought to be inspected, copied, or examined shall pertain to an investigation in progress by any public agency, the right of access provided for in [OPRA] may be denied if the inspection, copying or examination of such record or records shall be inimical to the public interest; provided, however, that this provision shall not be construed to allow any public agency to prohibit access to a record of that agency that was open for public inspection, examination, or copying before the investigation commenced.

> [N.J.S.A. 47:1A-3(a).]

Consequently, the public agency must prove that the records: (1) pertain to an investigation in progress, and (2) that their release would be inimical to the public interest. Courier News, supra, 358 N.J. Super. at 380 (citation omitted). Whether a record is "inimical to the public interest" is a determination that must be made on a case-by-case basis. Moreover, the need for confidentiality declines after the close of the investigation. Keddie v. Rutgers, 148 N.J. 36, 54 (1997).

Here, Judge Grasso held that the MVR recordings preceded any investigation and, thus, the "investigation in progress" exception did not apply. See N.J.S.A. 47:1A-3(a) ("[T]his provision shall not be construed to allow any public agency to prohibit access to a record . . . that was open [to the public] before the investigation commenced.").

Given the record before us, Judge Grasso properly held that the video preceded any investigation. Moreover, although he did not explicitly address the second prong of this exception — whether disclosure would be inimical to the public interest — Judge Grasso's examination of the MVR recordings, like ours, does not support a conclusion that their release would meet that standard. Detective Halliday's unsupported and unexplained statements in his September 2014 certification are insufficient to create a fact issue for further consideration on a remand. Accordingly, we decline to remand on this issue given the record made by the OCPO.

### 3. Remaining Arguments

Finally, we address the OCPO's arguments concerning the applicability of other OPRA exclusions because those exclusions are not applicable to the facts of this case.

The OCPO argues that the MVR recordings are excluded from public access under the executive order exemption. See N.J.S.A. 47:1A-9(a) ("The provisions of this act . . . shall not abrogate any exemption of a public record or government record from public access heretofore made pursuant to . . . Executive Order of the Governor . . . ."). It then cites an executive order issued by Governor Whitman that exempted "fingerprint cards, plates and photographs and similar criminal investigation records that are required to be made, maintained or kept by any State or local governmental agency." Exec. Order No. 69 (May 15, 1997), Laws of New Jersey 1997, Vol. 2 at 2321.

However, the OCPO did not raise the executive order exemption before the trial court. "Generally, issues not raised [before the trial court], even constitutional issues, will not ordinarily be considered on appeal unless they are jurisdictional in nature or substantially implicate public interest." State v. Walker, 385 N.J. Super. 388, 410 (App. Div.) (citing Nieder v. Royal Indem. Ins., 62 N.J. 229, 234 (1973), and Ferraro v. Demetrakis, 167 N.J. Super. 429, 431—32 (App. Div.), certif. denied, 81 N.J. 290 (1979)), certif. denied, 187 N.J. 83 (2006). On the other hand, "[a]n issue not raised below may be considered by th[is] court it if meets the

plain error standard or is otherwise of special significance to the litigant, to the public, or to achieving substantial justice, and the record is sufficiently complete to permit its adjudication." Ibid.

Here, the OCPO may not rely on the executive order exemption. While the exemption implicates the public's interest in the access to public records, the OCPO, as the governmental agency denying access, had an obligation to raise this argument within a reasonable time. OPRA proceedings are designed to be summary proceedings with the goal that records be produced in a reasonable time to the public. Mason, supra, 196 N.J. at 69 ("[C]itizens are entitled to swift access to public records, and both the public and governmental bodies are logically entitled to have any disputes brought and addressed in the same, rapid manner."); see also N.J.S.A. 47:1A-6 (action filed in Superior Court must "proceed in a summary or expedited manner"); N.J.S.A. 47:1A-5(i) (public agency must grant or deny access to government record "as soon as possible, but not later than seven business days"). Consequently, we decline to afford the OCPO, as the governmental agency, the unfair advantage of raising a new exclusion for the first time on appeal or remand, especially given Judge Grasso's adjournment of the return date of the order

to show cause to allow the parties additional time to marshal and submit "supplemental briefs, certifications and evidence."

Moreover, in light of the OCPO's failure to raise the executive order exemption below, this court shall not consider whether any other circumstances warrant consideration of this exemption on appeal. See Walker, supra, 385 N.J. Super. at 410 (emphasizing that an issue not raised in the trial court should not be considered on appeal).

b.

The OCPO also argues that the MVR recordings are unfiled discovery, which is protected by N.J.S.A. 47:1A-9(b) as a "privilege or grant of confidentiality" established or recognized by judicial case law, and thus is not required to be disclosed. We have recognized that OPRA incorporates the confidentiality afforded to unfiled discovery materials. Drinker Biddle, supra, 421 N.J. Super. at 497–98; see also Estate of Frankl v. Goodyear Tire & Rubber Co., 181 N.J. 1, 10 (2004) (citations omitted) ("The universal understanding in the legal community is that unfiled documents in discovery are not subject to public access."). In Drinker Biddle, we held that when a public agency received discovery from a private party during litigation, and the materials were never filed, the materials remained confidential and inaccessible under OPRA even

38

though the materials were then in the possession of a public agency. <u>Drinker Biddle</u>, <u>supra</u>, 421 <u>N.J. Super.</u> at 498.

Here, the OCPO did not receive the MVR recordings through discovery from a private party. Instead, the recordings were made by a governmental agency as part of law enforcement training activities and not as discovery materials for litigation. That the recordings have turned out to be relevant discovery in subsequently filed criminal and civil actions does not make them unfiled discovery within the meaning of <u>N.J.S.A.</u> 47:1A-9(b).

c.

The OCPO and the Prosecutors Association argue that the trial court erred in determining that the public's interest in disclosure of the video outweighed the driver's privacy interest. We disagree.

OPRA's privacy clause states that "a public agency has a responsibility and an obligation to safeguard from public access a citizen's personal information with which it has been entrusted when disclosure thereof would violate the citizen's reasonable expectation of privacy." <u>N.J.S.A.</u> 47:1A-1; <u>see also</u> <u>Burnett</u>, <u>supra</u>, 198 <u>N.J.</u> at 427. To balance competing interests in privacy and public access, a court must apply the <u>Doe</u> factors:

A-4226-14T3

> (1) the type of record requested; (2) the information it does or might contain; (3) the potential for harm in any subsequent nonconsensual disclosure; (4) the injury from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards to prevent unauthorized disclosure; (6) the degree of need for access; and (7) whether there is an express statutory mandate, articulated public policy, or other recognized public interest militating toward access.
>
> [Id. at 427 (quoting Doe v. Poritz, 142 N.J. 1, 88 (1995)).]

This balancing exercise requires a case-specific analysis, and appellate review of the trial court's application of the factors is de novo. In re N.J. Firemen's Ass'n, 443 N.J. Super. 238, 264 (App. Div. 2015) (citations omitted), certif. granted, 224 N.J. 528 (2016).

In this case, the trial court reviewed the MVR recordings in camera and determined that the driver had no privacy expectation that overcame the public's right of access. Having conducted an independent in camera review, and in consideration of the Doe factors, we agree. The recordings requested are from MVRs in police vehicles. The information contained relates to a motor vehicle stop that took place in a public setting. The recordings do not contain personal information about the driver. Focusing only on the privacy interest, there is no potential harm in any subsequent disclosure of the recordings because, if

they are not excluded under OPRA, the public has a right to view them. There is also no injury from disclosure to the relationship during which the recordings were made. Drivers and passengers in vehicles operating on public roadways do not have a reasonable expectation of privacy in an MVR recording. The reality of modern life is that video recordings are made in many public places. The other Doe factors also militate in favor of public access as compared to any legitimate expectation of privacy a driver might have.[4]

d.

The remainder of the arguments on appeal, including the OCPO's challenge to the counsel fee award, are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). Furthermore, as we affirm the judgment of the Law Division ordering the disclosure of the MVR recordings under OPRA, we need not conduct a common law analysis.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[4] Plaintiff filed a motion to supplement the record with a letter concerning the privacy issue. We deny that motion because we generally do not consider facts or materials that were not presented to the trial court. See Liberty Surplus Ins. v. Nowell Amoroso, P.A., 189 N.J. 436, 452 (2007). Moreover, given our resolution of the privacy issue, there is no need for a consideration of the supplemental letter.

**GILSON, J.S.C. (temporarily assigned), dissenting.**

The majority holds that an order issued by a chief of police in one municipality makes MVR recordings "documents" that are "required by law to be made" within the meaning of the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13. The majority also holds that the MVR recordings did not pertain to a criminal investigation of an eluding incident. Accordingly, the majority concludes that the MVR recordings are not "criminal investigatory records" under OPRA. I disagree. I would reverse the order of the Law Division and hold that the MVR recordings in this case are exempt as criminal investigatory records. Thus, I would remand for a determination of whether the MVRs recordings could be accessed under the common law, an issue the Law Division never reached.

## I.

The facts are contained in certifications submitted in connection with an order to show cause application. While the record is based on a summary proceeding, certain material facts are established by the record.

This incident began with a driver eluding a police officer in Tuckerton Borough and ended with the driver allegedly being assaulted through the use of a police dog when the driver was

eventually stopped and arrested in Barnegat Township. There were, thus, two separate and distinct criminal investigations: (1) the driver's eluding and motor vehicle offenses; and (2) the Tuckerton police officer's alleged misconduct and aggravated assault concerning his use of a police dog during the arrest of the driver.

The MVR recordings at issue were made by dashboard cameras in Barnegat Township police vehicles. Given these facts the only logical explanation is that the Barnegat police were notified of the eluding incident as the car chase was headed towards Barnegat. Consequently, the responding Barnegat police officers who activated their MVRs did so in response to an ongoing eluding incident.

## II.

The majority correctly points out that OPRA accords the public a broad right of access to government records "to ensure an informed citizenry and to minimize the evils inherent in a secluded process." Times of Trenton Publ'g Corp. v. Lafayette Yard Cmty. Dev. Corp., 183 N.J. 519, 535 (2005) (quoting Asbury Park Press v. Ocean Cty. Prosecutor's Office, 374 N.J. Super. 312, 329 (Law Div. 2004)).

In enacting OPRA, however, the Legislature also recognized that certain "confidential" information collected by the

government needed to be exempted from disclosure. <u>N.J.S.A.</u> 47:1A-1.1. One such category of exempted information is "criminal investigatory records." <u>Ibid.</u> OPRA defines a "criminal investigatory record" as "a record which is not required by law to be made, maintained or kept on file that is held by a law enforcement agency which pertains to any criminal investigation or related civil enforcement proceeding." <u>Ibid.</u>

The majority correctly points out that the starting point in interpreting a statute is to look at the plain language of the statute. <u>See</u> <u>Acoli v. N.J. State Parole Bd.</u>, 224 <u>N.J.</u> 213, 227 (2016). OPRA's definition of "criminal investigatory record" makes clear that there are two factors that must be shown by the public agency: (1) the record is not required by law to be made, and (2) the record pertains to a criminal investigation or related civil enforcement proceeding. <u>N.J.S.A.</u> 47:1A-1.1; <u>see also</u> <u>N. Jersey Media Grp., Inc. v. Twp. of Lyndhurst</u>, 441 <u>N.J. Super.</u> 70, 90 (App. Div.), <u>leave to appeal granted</u>, 223 <u>N.J.</u> 553 (2015); <u>O'Shea v. Twp. of W. Milford</u>, 410 <u>N.J. Super.</u> 371, 380-81 (App. Div. 2009).[1]

---

[1] I agree with the majority that the public agency bears the burden to establish that a document or record is exempt under OPRA. I also agree with the majority's holding that the driver had no privacy expectations that overcame the public's right of access.

A.

Turning to the first factor, the question is whether the MVR recordings here were required by law to be made. The Law Division held, and the majority agrees, that the MVR recordings were required by law to be made because the Barnegat Chief of Police had issued a "general order" in his municipality to activate MVRs when there is a traffic or law enforcement stop. I submit that the plain language of OPRA does not support the conclusion that an order issued by a municipal chief of police creates a "law" requiring a document to be made within the meaning of OPRA.

The term "law," though given a variety of meanings depending on its context, Seatrain Lines, Inc. v. Medina, 39 N.J. 222, 230 (1963), is generally understood to include duly enacted statutes, ordinance, regulations, decisional law established by courts, and executive orders. Id. at 231 (holding in context of the Temporary Disability Benefits Law, the word "law" meant "statutory law or common law rule or doctrine"); State v. Atlantic City Elec. Co., 23 N.J. 259, 270 (1957) (stating that "the rules and regulations of a State administrative agency, duly promulgated under properly delegated powers, have the force and effect of law"); Winberry v. Salisbury, 5 N.J. 240, 247-48 (holding that the word "law" in

the phrase "subject to law" meant substantive as opposed to procedural law, and included not only legislation but also common law), cert. denied, 340 U.S. 877, 71 S. Ct. 123, 95 L. Ed. 638 (1950); State v. Duble, 172 N.J. Super. 72, 75 (App. Div. 1979) (holding that it has long been recognized that "a municipal resolution, unlike an ordinance, is not a law" and that "the term law 'when used without restriction or qualification, refers to the public law of the state'" (first citing then quoting In re Haque, 104 N.J. Eq. 31, 63 (Ch.), aff'd by an equally divided court, 104 N.J. Eq. 369 (E. & A. 1929))); see also Clark v. Degnan, 163 N.J. Super. 344, 372 (App. Div. 1978), aff'd as modified, 83 N.J. 393 (1980). Importantly, when counties or municipalities enact ordinances, they do so only when the State Legislature expressly delegates the authority for them to act. Holmdel Builders Ass'n v. Twp. of Holmdel, 121 N.J. 550, 566 (1990).

Consequently, when enacting the "criminal investigatory records" exemption in OPRA, the Legislature would have understood the term "law" to include duly enacted statutes, regulations, executive orders, and decisional case law. Moreover, since the Legislature was not delegating power under OPRA to municipalities, there is nothing to suggest that it would have contemplated ordinances. Even more clearly, nothing

in the plain language use of "law" would suggest that the Legislature had in mind orders issued by a local police chief that did not go through any legislative, municipal, or regulatory review process. In other words, unlike laws and regulations, the order that was issued here was issued by one individual without any established process of review or comment by the public.

Both the Law Division and the majority point to N.J.S.A. 40A:14-118 as the statute that delegates the authority to the chief of police to create a "law." N.J.S.A. 40A:14-118, however, provides a specific delegation of power to the "governing body of any municipality" to create a police force; it does not provide a chief of police authority to create law. Specifically, that statute authorizes the "governing body of any municipality, by ordinance," to create a police force, "provide for a line of authority relating to the police function," and appoint a chief of police. Ibid. N.J.S.A. 40A:14-118 then goes on to state:

> Any such ordinance, or rules and regulations, shall provide that the chief of police, if such position is established, shall be the head of the police force and that he [or she] shall be directly responsible to the appropriate authority for the efficiency and routine day to day operations thereof, and that he [or she] shall, pursuant to policies established by the appropriate authority:

> a. Administer and enforce rules and regulations and special emergency directives for the disposition and discipline of the force and its officers and personnel;
>
> b. Have, exercise, and discharge the functions, powers and duties of the force;
>
> c. Prescribe the duties and assignments of all subordinates and other personnel;
>
> d. Delegate such of his [or her] authority as he [or she] may deem necessary for the efficient operation of the force to be exercised under his [or her] direction and supervision; and
>
> e. Report at least monthly to the appropriate authority in such form as shall be prescribed by such authority on the operation of the force during the preceding month, and make such other reports as may be requested by such authority.

Nowhere in N.J.S.A. 40A:14-118 did the Legislature expressly or implicitly delegate to a chief of police authority to make a "law." While the Barnegat Chief of Police may have been authorized to issue his order to the police officers working under him, such a directive does not become a law. I, therefore, disagree with the majority's holding that a record required by a local law enforcement order "is the equivalent of a record required by law."

OPRA's legislative history also does not support the conclusion that the term "law" should be read broadly. In North Jersey Media Group, a panel of this court thoroughly analyzed the Legislature's intent in enacting OPRA. N. Jersey Media Grp., supra, 441 N.J. Super. at 93-97. As noted by both the majority here and the panel in North Jersey Media Group, the Legislature expressed its concern that OPRA's predecessor statute, the Right-to-Know Law, L. 1963, c. 73, repealed by OPRA, L. 2001, c. 404, was too limited in providing access to public records. N. Jersey Media Grp., supra, 441 N.J. Super. at 93-94. The Legislature thus enacted OPRA with its broad provisions to increase access to public records. Id. at 94. The Legislature also created twenty-one exemptions, including the pre-existing criminal investigatory records exemption. N.J.S.A. 47:1A-1.1; N. Jersey Media Grp., supra, 441 N.J. Super. at 93-94. The panel in North Jersey Media Group is persuasive in its analysis of the specific legislative history in concluding that the history of that exemption warrants a narrow reading of the "required by law" factor. Id. at 97.

The majority's conclusion that the word "law" deserves a broad reading rests on the directive in N.J.S.A. 47:1A-1 to construe the provisions of OPRA "in favor of the public's right of access." That provision, however, was not meant to eliminate

8                                                          A-4226-14T3

the exemptions to OPRA. To hold that an order issued by a municipal chief of police makes a document required by law, would, by logical extension, effectively eliminate the criminal investigatory records exemption. Applying the majority's reasoning, any time there is a written directive calling for a document to be created in a police department that document would be required by law to be made and, thus, would not come within the ambit of "criminal investigatory records." It is hard to imagine that there are any criminal investigatory documents created in a police department for which there is not an order, directive or instruction calling for that document to be prepared. For example, if a police department issued instructions that officers were to prepare reports concerning all criminal investigations, under the reasoning used by the majority any and all such reports would be subject to disclosure under OPRA.

Further, in my view, a review of existing case law also does not support the conclusion that an order issued by a chief of police creates documents that are "required by law to be made." Our court has addressed the criminal investigatory records exemption in two cases that adopt different interpretations of the scope of what "required by law" means. See N. Jersey Media Grp., supra, 441 N.J. Super. at 96-103;

O'Shea, supra, 410 N.J. Super. at 381-85. In O'Shea, the court held that the Attorney General's "Use of Force Policy" that required the completion of Use of Force Reports (UFRs) has the force of law for police entities. Id. at 384. Accordingly, in O'Shea, the court held that UFRs were not criminal investigatory records and were not exempt from access under OPRA. Id. at 385-86. In so holding, the O'Shea court rejected the argument that case law decided under the Right-to-Know Law provided guidance on interpreting OPRA's "not required by law to be made" standard. Id. at 381.

In North Jersey Media Group, another panel rejected O'Shea's ruling and concluded that "it is appropriate to interpret the 'criminal investigatory records' exception in OPRA" by looking at "pre-OPRA case law interpreting the [Right-to-Know Law's] 'required by law' standard in cases involving requests for records pertaining to criminal investigations." N. Jersey Media Grp., supra, 441 N.J. Super. at 96 & n.16 (expressly disagreeing with O'Shea's conclusion that the Right-to-Know Law was inapplicable). North Jersey Media Group arose from an OPRA request that sought various records from local, county, and state law enforcement agencies concerning a fatal police shooting of a criminal suspect. Id. at 81-82. Police MVR recordings were among the records sought. Ibid. The court

in North Jersey Media Group held that a record is "required by law to be made" if its creation is "mandated by a statute, regulation, executive order, or judicial decision." Id. at 97. Thus, a record subject to "a generic record retention policy, or an internal agency directive of a public official" is not one that is required to be made by law. Ibid.

I believe that under either the rationale used in O'Shea or the rationale used in North Jersey Media Group, the MVR records here were not required by law to be made. Under the definition of "required by law" adopted by North Jersey Media Group, a local law enforcement order clearly would not be considered an order that requires a record to be made by law. While the definition adopted by O'Shea was broader than the definition used in North Jersey Media Group, the O'Shea definition would also not cover a local order that applied only in one municipality. O'Shea dealt with an Attorney General directive that applied statewide. Moreover, the Attorney General, as the chief law enforcement officer of the state, has the statutory authority to issue such statewide directives. See O'Shea, supra, 410 N.J. Super. at 382 (citing "Criminal Justice Act of 1970," N.J.S.A. 52:17B-97 to -117; In re Gen. Disciplinary Hearing of Carberry, 114 N.J. 574, 577-78 (1989); and In re Carroll, 339 N.J. Super. 429, 439 (App. Div.), certif. denied,

170 <u>N.J.</u> 85 (2001)).  In contrast, here, we are dealing with an order issued by the chief of police of one municipality.  Such a local order does not constitute an order that makes records "required by law to be made" under OPRA because it does not have statewide application and it was only issued by a local police chief.[2]

In summary, a review of the language of OPRA, its legislative history, and case law do not support the conclusion that the MVR records in this case were required to be made by law.  As the majority noted, further guidance on the scope of the "criminal investigatory records" exemption to OPRA may be provided given that our Supreme Court has granted certification to review the decision in <u>North Jersey Media Group</u>.  <u>N. Jersey Media Grp.</u>, <u>supra</u>, 223 <u>N.J.</u> 553.  In the meantime, the analysis provided in <u>North Jersey Media Group</u> is persuasive in its comprehensive review of the legislative history of OPRA and the case law under the Right-to-Know Law.  <u>See</u> <u>N. Jersey Media Grp.</u>, <u>supra</u>, 441 <u>N.J. Super.</u> at 92-103.

---

[2]  Effective March 1, 2015, a new statute required MVRs to be placed in all new police vehicles that are primarily used in traffic stops.  <u>N.J.S.A.</u> 40A:14-118.1.  That statute, however, was declared unconstitutional by the Council on Local Mandates.  <u>In re Complaint Filed by Deptford Twp.</u>, No. COLM-0003-15 (Council on Local Mandates April 20, 2016), http://www.state.nj.us/localmandates/decisions.  Moreover, the statute did not expressly require when MVR recordings would need to be made.

The trial court, here, did not address the second factor of the criminal investigatory record exemption; that is, whether the MVR recordings pertained to a criminal investigation. Nevertheless, the majority reviewed the record and concluded that the OCPO had not carried its burden to establish that the MVR recordings pertained to a criminal investigation. I again disagree. While the record was summary, the record supports the conclusion that the MVR recordings were initiated to investigate an in-progress eluding incident.

Both North Jersey Media Group and O'Shea discussed this second factor of the criminal investigatory records exemption. Addressing MVR recordings, the court in North Jersey Media Group concluded that "when an officer turns on a mobile video recorder to document a traffic stop or pursuit of a suspected criminal violation of law, that recording may pertain to a 'criminal investigation,' albeit in its earliest stages." N. Jersey Media Grp., supra, 441 N.J. Super. at 104-05. The North Jersey Media Group court did not "address whether a recording initiated to document a suspected non-criminal violation of motor vehicle law or a subsequent stop would properly be deemed to 'pertain[] to any criminal investigation.'" Id. at 105 n.21 (alteration in original). Moreover, the court in North Jersey Media Group also

held that a record created before an investigation started does not pertain to that investigation. Id. at 104.

In O'Shea, the court reasoned:

> In the absence of a factual showing that any of the reports sought in this matter pertained to an actual criminal investigation or to an existing related civil enforcement proceeding, we decline to adopt the position . . . that UFRs should, generically, be regarded to be shielded from public access as records [pertaining to an investigation].

[O'Shea, supra, 410 N.J. Super. at 385.]

The certifications currently in the record state that the "video recording pertains to two ongoing, active criminal investigations . . . . The video also pertains to two separate internal affairs investigations of the [Tuckerton] police officer . . . ." The certifications also add that disclosure of the MVR recordings "would compromise ongoing criminal and internal affairs investigations and jeopardize any further developments in these investigations." The existing record makes clear that the MVR recordings at issue here were made before there was any contemplation of a criminal investigation concerning the Tuckerton police officer. Nevertheless, the existing record also supports the conclusion that the MVR recordings were started at a time when the Barnegat police were already investigating an eluding incident.

In evaluating the existing record, it is important to focus on the language used by the Legislature in enacting OPRA. The word "pertains" is defined as "to relate to someone or something" or "to have a connection to a person or thing." Pertain, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/pertain (last visited June 20, 2016). Our Supreme Court has stated that an "investigation" begins when "the inquiry departs from the routine and focuses with special intensity upon a particular party." McClain v. Coll. Hosp., 99 N.J. 346, 357 (1985) (quoting Ctr. for Nat'l Policy Review on Race & Urban Issues v. Weinberger, 502 F.2d 370, 373 (D.C. Cir. 1974)). Applying the plain meaning of the word "pertains" to the facts of this case, the MVR recordings pertained to the eluding investigation.

In summary, I would hold that the MVR recordings here were exempt from disclosure under OPRA as criminal investigatory records. Consequently, I would reverse the order of the Law Division and remand for a determination of whether plaintiff is entitled to access under the common law.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4226-14T3