SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

### North Jersey Media Group, Inc. v. Township of Lyndhurst (A-35-15) (076184)

**Argued November 9, 2016 -- Decided July 11, 2017**

**RABNER, C.J., writing for the Court.**

This appeal explores the scope of the Open Public Records Act (OPRA)'s exemptions for criminal investigatory records and records of investigations in progress, as well as the common law right of access.

On September 16, 2014, a North Arlington resident called 9-1-1 to report an attempt to break into a car. The police tried to stop the suspect's car, but the driver—later identified as Kashad Ashford—eluded them and led police on a high-speed chase. At one point, Ashford tried to ram a patrol car head-on. Ashford ultimately lost control of his vehicle and crashed it into a guardrail at an overpass. According to the Attorney General's press release, Ashford tried to get free of the barrier by accelerating, which caused the car to "jerk[] in a rear and forward motion." An unidentified officer said that he thought the SUV might strike and possibly kill him and another officer. Both of those officers—as well as others—fired at Ashford, who was pronounced dead hours later.

Within days of the shooting, a reporter from The Record and another from the South Bergenite filed requests for records under OPRA and the common law right of access. The records custodians gave varied responses. None of them produced any materials before plaintiff North Jersey Media Group, Inc. (NJMG) filed a complaint and order to show cause. At the time, NJMG owned The Record and the South Bergenite. The two-count complaint alleged violations of OPRA and the common law right of access. NJMG sought release of the requested records, or their review in camera, along with fees and costs.

On January 12, 2015, the Honorable Peter E. Doyne, A.J.S.C., found that defendants had improperly withheld the requested records. In a detailed written opinion, he concluded that neither OPRA's criminal investigatory records exception nor its ongoing investigation exception applied. The court directed defendants to release unredacted copies of records within three days in response to NJMG's OPRA requests.

The Appellate Division reversed the order of disclosure and remanded for reconsideration. 441 N.J. Super. 70, 118-19 (App. Div. 2015). The panel concluded that, aside from the 9-1-1 recording, motor vehicle accident reports, and portions of Computer Aided Dispatch reports and other logs that do not relate to the criminal investigations, the requested documents fell within the criminal investigatory records exception. The Appellate Division remanded to the trial court to reconsider NJMG's request under N.J.S.A. 47:1A-3(a) and the common law.

On remand, the Honorable Bonnie J. Mizdol, A.J.S.C., ruled that defendants were not required to release the names of the officers or disclose two remaining Use of Force Reports (UFRs), three dash-cam videos, and three police reports. The court relied heavily on the need to maintain the integrity of the ongoing investigation.

The Court granted defendants' motion for leave to appeal, 223 N.J. 553 (2015), and relaxed the Court Rules to consider the judgment entered on remand.

**HELD**: NJMG was entitled to disclosure of unredacted Use of Force Reports, under OPRA, and dash-cam recordings of the incident, under the common law. Investigative reports, witness statements, and similarly detailed records were not subject to disclosure at the outset of the investigation, when they were requested.

1. Under OPRA, N.J.S.A. 47:1A-1 to -13, "government records" are subject to disclosure unless a public agency can demonstrate that an exemption applies. This appeal involves two specific exemptions. A record need only satisfy one exception to be exempt from disclosure. (pp. 10-13)

2. To qualify for OPRA's criminal investigatory records exception—and be exempt from disclosure—a record (1) must not be "required by law to be made," and (2) must "pertain[] to a criminal investigation." N.J.S.A. 47:1A-1.1. The Attorney General's Use of Force Policy requires that "[i]n all instances when physical, mechanical, or deadly force is used, each officer who has employed such force shall complete" a "Use of Force Report." The Court agrees that the Policy has "the force of law for police entities." O'Shea v. Township of West Milford, 410 N.J. Super. 371, 382 (App. Div. 2009). And because Use of Force Reports are "required by law to be made," they cannot be exempt from disclosure under OPRA's criminal investigatory records exemption. (pp. 24-27)

3. No one has pointed to an Attorney General directive relating to the use of dash-cams. NJMG points to general retention schedules to implement the Destruction of Public Records Law and contends they satisfy the "required by law" standard. If that were the case, the Right to Know Law's narrow definition of public records would have been anything but narrow. And because many records that pertain to criminal investigations must be retained, the criminal investigatory records exception would have little meaning. The Court is unable to conclude that the Legislature intended those results. To be exempt from disclosure, a record must also "pertain[] to any criminal investigation." N.J.S.A. 47:1A-1.1. Here, the actions of the police all pertained to an investigation into actual or potential violations of criminal law. The recordings also pertained to the Shooting Response Team investigation into Ashford's fatal shooting. The records fall within the criminal investigatory records exception. (pp. 27-31)

4. N.J.S.A. 47:1A-3(b) requires the release of "information as to the identity of the investigating and arresting personnel." The certification of Paul Morris, Chief of Detectives of the Division of Criminal Justice, focuses on why defendants need not identify by name the officers who discharged their weapons. The carefully detailed reasons apply to nearly all cases in which an officer uses deadly force. Although section 3(b) does not require the State to demonstrate an actual threat against an officer, generic reasons alone cannot satisfy the statutory test. OPRA requires the State to show that disclosure of the identity of an officer "will jeopardize the safety of any person . . . or any investigation in progress" or "would be harmful to a bona fide law enforcement purpose or the public safety." Ibid. OPRA adds that "[w]henever a law enforcement official determines that it is necessary to withhold information, the official shall issue a brief statement explaining the decision." Ibid. Here, although defendants offered a brief explanation, their reasons did not satisfy those standards. (pp. 31-36)

5. To avail itself of the ongoing investigation exception, a public agency must show that (1) the requested records "pertain to an investigation in progress by any public agency," (2) disclosure will "be inimical to the public interest," and (3) the records were not available to the public before the investigation began. N.J.S.A. 47:1A-3(a). Investigative reports prepared after a police shooting ordinarily contain factual details and narrative descriptions of the event. As a result, the danger to an ongoing investigation would typically weigh against disclosure of reports while the investigation is underway, particularly in its early stages. The release of UFRs presents far less of a risk of taint to an ongoing investigation because UFRs contain relatively limited information. Also, defendants in this case raised only general safety concerns. Under the circumstances, the UFRs should have been released without redactions. (pp. 36-44)

6. NJMG also sought access to records in this case under the common law, which requires a greater showing than OPRA: (1) the person seeking access must establish an interest in the subject matter of the material; and (2) the citizen's right to access must be balanced against the State's interest in preventing disclosure. The Attorney General's interest in the integrity of investigations is strongest when it comes to the disclosure of investigative reports, witness statements, and other comparably detailed documents. In those areas, the State's interest outweighs NJMG's. The balance can tip in favor of disclosure, however, for materials that do not contain narrative summaries and are less revealing. Footage of an incident captured by a police dashboard camera, for example, can inform the public's strong interest in a police shooting that killed a civilian. It can do so without placing potential witnesses and informants at risk and without undermining the integrity of an investigation. Based on its in camera review of the certifications the State submitted in this case, the Court notes that the State advanced only generic safety concerns. Under the circumstances of this case, the public's substantial interest in disclosure of dash-cam recordings warranted the release of those materials under the common law right of access. (pp. 44-48)

The judgment of the Appellate Division is **AFFIRMED in part and REVERSED in part**.

**JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in CHIEF JUSTICE RABNER's opinion.**

NORTH JERSEY MEDIA GROUP, INC.,

    Plaintiff-Appellant,

        v.

TOWNSHIP OF LYNDHURST, HELEN POLITO, RMC, in her capacity as the Custodian of Records for the Township of Lyndhurst, BOROUGH OF NORTH ARLINGTON, KATHLEEN MOORE, in her capacity as the Custodian of Records for the Borough of North Arlington, BOROUGH OF RUTHERFORD, MARGARET M. SCANLON, RMC, in her capacity as the Custodian of Records for the Borough of Rutherford, BERGEN COUNTY POLICE DEPARTMENT, CAPTAIN UWE MALAKAS, in his capacity as Custodian of Records for the Bergen County Police Department,

    Defendants,

        and

NEW JERSEY STATE POLICE and SERGEANT HARRY ROCHESKEY, in his capacity as Custodian of Records for the New Jersey State Police,

    Defendants-Respondents.

Argued November 9, 2016 – Decided July 11, 2017

On appeal from the Superior Court, Appellate Division, whose opinion is reported at 441 N.J. Super. 70 (App. Div. 2015).

Samuel J. Samaro argued the cause for appellant (Pashman Stein, attorneys; Mr. Samaro and Jennifer A. Borg, of counsel; Mr. Samaro, CJ Griffin, and James W. Boyan III, on the briefs).

Raymond R. Chance, III, Assistant Attorney General, argued the cause for respondents (Christopher S. Porrino, Attorney General of New Jersey, attorney; Mr. Chance and Jeffrey S. Jacobson, Assistant Attorney General, of counsel; Mr. Chance, Mr. Jacobson, and Daniel M. Vannella, Deputy Attorney General, on the briefs).

Thomas J. Cafferty argued the cause for amici curiae The Reporters Committee for Freedom of the Press, New Jersey Press Association, Advance Publications, Inc., American Society of News Editors, The Associated Press, Association of Alternative Newsmedia, First Look Media, Inc., Gannett Co., Inc., Investigative Reporting Workshop at American University, MPA – The Association of Magazine Media, National Association of Black Journalists, National Newspaper Association, The National Press Club, National Press Photographers Association, The New York Times Company, Online News Association, Society of Professional Journalists, and the Tully Center for Free Speech (Gibbons, attorneys; Mr. Cafferty and Nomi I. Lowy, of counsel and on the brief).

Walter M. Luers argued the cause for amici curiae New Jersey Foundation for Open Government and Police Accountability Project of New Jersey Libertarian Party (Mr. Luers and Richard M. Gutman, attorneys; Mr. Gutman, on the brief).

2

Alexander R. Shalom argued the cause for amici curiae American Civil Liberties Union of New Jersey, Association of Black Women Lawyers of New Jersey, Black Lives Matter-NJ, Garden State Bar Association, Garden State Equality, Latino Action Network, Latino Leadership Alliance, LatinoJustice – PRLDEF, and People's Organization for Progress (Edward L. Barocas, Legal Director, attorney; Mr. Barocas, Mr. Shalom, Iris Bromberg, and Jeanne M. LoCicero, on the brief).

Michael A. Bukosky argued the cause for amicus curiae State Troopers Fraternal Association and Bergen County Policemen's Benevolent Association Conference (Loccke, Correia, & Bukosky, attorneys).

Jeffrey S. Mandel, attorney for amicus curiae Association of Criminal Defense Lawyers of New Jersey, joined in the brief of American Civil Liberties Union of New Jersey (Cutolo Mandel, attorneys).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

This appeal explores the scope of two exceptions in the Open Public Records Act (OPRA): exemptions for criminal investigatory records, N.J.S.A. 47:1A-1.1, and records of investigations in progress, N.J.S.A. 47:1A-3. The matter also implicates the common law right of access.

The case arises out of a high-speed chase in which a suspect eluded the police, crashed into a guardrail, and reportedly placed officers in danger as he tried to drive away. The officers then fired at the suspect and killed him. Two reporters filed OPRA requests for the names of the officers who

used deadly force. The reporters also sought access to Use of Force Reports, dash-cam videos, activity logs, various investigative reports, and related items.

The trial court ordered the records disclosed. For the most part, the Appellate Division concluded the items were exempt from disclosure under OPRA. N. Jersey Media Grp., Inc. v. Township of Lyndhurst (NJMG), 441 N.J. Super. 70, 78-79, 105 (App. Div. 2015). We consider the two exemptions the panel analyzed and the common law right of access.

OPRA's criminal investigatory records exception does not apply to records that are "required by law to be made, maintained or kept on file." N.J.S.A. 47:1A-1.1. As a result, the exemption does not cover Use of Force Reports, which the Attorney General requires officers to prepare after the use of deadly force.

To analyze OPRA's exemption for records of ongoing investigations, courts must weigh various factors to decide whether disclosure will "be inimical to the public interest." N.J.S.A. 47:1A-3(a). We conclude that the danger to an ongoing investigation would typically weigh against disclosure of detailed witness statements and investigative reports while the investigation is underway, under both OPRA and the common law. Footage captured by dashboard cameras, however, presents less of a risk. Under the common law, the public's powerful interest in

4

disclosure of that information, in the case of a police shooting, eclipses the need for confidentiality once the available, principal witnesses to the shooting have been interviewed. In an ordinary case, investigators take statements from those witnesses soon after an incident, while the events are fresh in mind.

We therefore affirm in part and reverse in part the judgment of the Appellate Division.

I.

To recount the facts, we rely on press releases and certifications by the Attorney General and other law enforcement officers, as well as other materials in the record.

Shortly after 2 a.m. on September 16, 2014, a North Arlington resident called 9-1-1 to report an attempt to break into a car in her driveway. The caller described the suspect and the car he drove away in -- a black SUV. Police dispatchers in North Arlington radioed information to officers in the area, and officers from North Arlington, Lyndhurst, Rutherford, and the Bergen County Police Department (BCPD) looked for the vehicle. At some point, New Jersey State Police troopers also got involved. An officer from Lyndhurst first spotted the SUV, which the police confirmed was stolen.

The police tried to stop the suspect's car, but the driver -- later identified as Kashad Ashford -- eluded them and led

police on a high-speed chase through several towns for about four minutes. At one point, Ashford tried to ram a Lyndhurst patrol car head-on. Ashford ultimately lost control of his vehicle and crashed it into a guardrail at an overpass on Route 3.

Officers then positioned their patrol cars around the SUV and ordered Ashford to stop the car. He refused. According to the Attorney General's press release, Ashford instead tried to get free of the barrier by accelerating, which caused the car to "jerk[] in a rear and forward motion."

An unidentified officer said that he thought the SUV might strike and possibly kill him and another officer. Both of those officers -- as well as others -- fired at Ashford, who was pronounced dead hours later. A passenger in the SUV, Jemmaine Bynes, was not shot. Police took him into custody and charged him with several firearms offenses and receiving stolen property.

When law enforcement officials are involved in a fatal shooting, the Director of the Division of Criminal Justice must be notified immediately -- "before any investigation of the incident is undertaken other than to secure the scene." Attorney General, Law Enforcement Directive No. 2006-5 (Directive), at 1-2 (Dec. 13, 2006). In response, the Attorney General's Shooting Response Team (SRT) may -- and, in some

6

cases, must -- conduct an investigation into the use of deadly force.  Id. at 2.

Here, the SRT launched an investigation, and the Attorney General issued a press release hours after the event.  The release recounted many of the facts described above.  Press Release, Attorney General, Attorney General's Shooting Response Team Investigates Fatal Shooting in Rutherford Involving State Police & Local Officers (Sept. 16, 2014).  It did not, however, reveal the names of the officers involved or say how many fired their weapons.  Ibid.

Each officer who uses deadly force must complete a "Use of Force Report" (UFR) along with "[a]ny reports made necessary by the nature of the underlying incident."  Attorney General, Use of Force Policy, at 7 (Apr. 1985, revised June 2000).  The UFR calls for information about the officer, the type of force used, and the subject and his or her conduct.

Within days of the shooting, a reporter from The Record and another from the South Bergenite filed requests for records under OPRA and the common law right of access.  The Record reporter asked Lyndhurst, North Arlington, Rutherford, and the BCPD for incident or investigation reports; log book notations and activity logs; audio recordings and written transcripts, including all 9-1-1 calls; arrest reports; UFRs; dash-cam videos from Mobile Video Recorders (MVRs) in police vehicles; motor

7

vehicle accident reports; Computer Aided Dispatch reports (CADs); Mobile Data Terminal Printouts; and all information required to be released under N.J.S.A. 47:1A-3(b). The reporter filed a similar request with the State Police later the same day.

The South Bergenite reporter asked Lyndhurst to disclose the following documents "as they [were] created": police reports about the pursuit; UFRs; "[a]ny additional documentation" about the incident; and "[a]ny video tape" or transcript "obtained during the course of the investigation."

The records custodians gave varied responses, which are described in the Appellate Division's decision. NJMG, supra, 441 N.J. Super. at 82-83. None of them produced any materials before plaintiff North Jersey Media Group, Inc. (NJMG) filed a complaint and order to show cause on November 3, 2014. At the time, NJMG owned The Record and the South Bergenite, among other news organizations.

The two-count complaint named Lyndhurst, North Arlington, Rutherford, the BCPD, the State Police, and their records custodians as defendants. The complaint alleged violations of OPRA and the common law right of access. NJMG sought release of the requested records, or their review in camera, along with fees and costs pursuant to N.J.S.A. 47:1A-6.

8

After NJMG filed its complaint, Rutherford and the State Police released a limited number of records. Rutherford's counsel candidly acknowledged that certain items should have been disclosed earlier. Id. at 83. Rutherford provided copies of a CAD report, property report, recordings of three phone calls from the public, recordings of radio transmissions, and three redacted investigation reports. A Vaughn index set forth reasons for the redactions. See Vaughn v. Rosen, 484 F.2d 820, 826-28 (D.C. Cir. 1973), cert. denied, 415 U.S. 977, 94 S. Ct. 1564, 39 L. Ed. 2d 873 (1974).

On December 22, 2014, the Attorney General, acting on behalf of defendants, released a recording of the original 9-1-1 call as well as redacted dispatch reports. NJMG, supra, 441 N.J. Super. at 84-85. The reports were contained within three other records from North Arlington, Lyndhurst, and the BCPD; all had been redacted and did not have the names of the officers involved. Id. at 85.

In response to the order to show cause, the Attorney General provided certifications in December 2014 from Detective Cortney Lawrence, the lead detective in the SRT investigation, and Lieutenant Robert McGrath, a supervisor in the Division of Criminal Justice.

Detective Lawrence represented that the SRT assumed control once the shooting took place, and that the investigations into

9

both the shooting and Bynes's conduct were ongoing.  Detective Lawrence claimed that all records after the initial 9-1-1 call were the "products" of an open criminal investigation.

Lieutenant McGrath explained the Attorney General's Directive and use of force policy.  He certified that when the SRT completed its ongoing investigation, the matter would likely be presented to a state grand jury.  Aside from the 9-1-1 recording and CAD reports relating to it, Lieutenant McGrath asserted that the release of "any of the other requested records . . . would irrevocably compromise the ongoing investigation" and "corrupt the independent recollections of witnesses."  He also offered to disclose "case-specific examples" -- under seal and ex parte -- of how "the integrity of the ongoing investigation" would be threatened by additional disclosures.

## II.

As background for the sections that follow, we discuss the State's Open Public Records Act, N.J.S.A. 47:1A-1 to -13, at this point.

OPRA succinctly sets forth the State's policy in favor of broad access to public records:  (1) "government records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions, for the protection of the public interest," N.J.S.A. 47:1A-1; (2) "any limitations on the right of access . . . shall be construed in

10

favor of the public's right of access," ibid.; and (3) public agencies "shall have the burden of proving that the denial of access is authorized by law," N.J.S.A. 47:1A-6.

Under that framework, "government records" -- which are defined broadly in N.J.S.A. 47:1A-1.1 -- are subject to disclosure unless a public agency can demonstrate that an exemption applies. To justify non-disclosure, the agency must make a "clear showing" that one of the law's listed exemptions is applicable. Asbury Park Press v. Ocean Cty. Prosecutor's Office, 374 N.J. Super. 312, 329 (Law Div. 2004). That approach serves the statute's aim "to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process." Mason v. City of Hoboken, 196 N.J. 51, 64 (2008) (quoting Asbury Park Press, supra, 374 N.J. Super. at 329).

This appeal involves two specific exemptions. First, OPRA exempts "criminal investigatory records" from the definition of "[g]overnment record." N.J.S.A. 47:1A-1.1. The Act defines a "criminal investigatory record" as "a record [1] which is not required by law to be made, maintained or kept on file that is held by a law enforcement agency [2] which pertains to any criminal investigation or related civil enforcement proceeding." Ibid. Thus, if a document meets both prongs of the exception, an agency need not disclose it. O'Shea v. Township of West

11

<u>Milford</u>, 410 <u>N.J. Super.</u> 371, 380-81 (App. Div. 2009). But if, for example, a record <u>is</u> required to be made by law, the exception does not apply.

Second, OPRA protects records of an ongoing investigation from disclosure. See <u>N.J.S.A.</u> 47:1A-3. The statute has two parts: section 3(a) covers records that pertain to an investigation in progress; section 3(b) identifies information that the public agency must disclose within 24 hours of a request.

More specifically, section 3(a) exempts from disclosure records that "pertain to an investigation in progress by any public agency" if their examination "shall be inimical to the public interest." <u>N.J.S.A.</u> 47:1A-3(a). In addition, the records must not have been "open for public inspection, examination, or copying before the investigation commenced." <u>Ibid.</u>

Section 3(b) identifies categories of "information concerning a criminal investigation" that "shall be available to the public within 24 hours or as soon as practicable, of a request." <u>N.J.S.A.</u> 47:1A-3(b). Among other items, the statute requires disclosure of "information as to the identity of the investigating and arresting personnel and agency." <u>Ibid.</u> The statute also mandates disclosure of "information of the circumstances immediately surrounding the arrest, including but

12

not limited to the time and place of the arrest, resistance, if any, pursuit, possession and nature and use of weapons and ammunition by the suspect and by the police." Ibid.

However, a public agency may withhold information otherwise required under section 3(b) when "it shall appear that the information requested or to be examined will jeopardize the safety of any person or jeopardize any investigation in progress or may be otherwise inappropriate to release." Ibid. The safety exception "shall be narrowly construed to prevent disclosure of information that would be harmful to a bona fide law enforcement purpose or the public safety." Ibid. A record need only satisfy one exception to be exempt from disclosure.

To interpret the exceptions, we rely on settled principles of statutory construction. We look first to the plain language of the statute to try to give meaning to the Legislature's intent. State v. Morrison, 227 N.J. 295, 308 (2016); DiProspero v. Penn, 183 N.J. 477, 492 (2005). If that language is ambiguous, we may turn to extrinsic sources. Parsons ex rel. Parsons v. Mullica Twp. Bd. of Educ., 226 N.J. 297, 308 (2016).

### III.

Against that backdrop, we return to the procedural history of this case.

On January 12, 2015, the Honorable Peter E. Doyne, A.J.S.C., ruled on NJMG's order to show cause and found that

13

defendants had improperly withheld the requested records.  In a detailed written opinion, he concluded that neither OPRA's criminal investigatory records exception nor its ongoing investigation exception applied.

The court initially observed that the Attorney General's press release did not satisfy the requirements of N.J.S.A. 47:1A-3(b) because OPRA mandates the disclosure of records, not information.  As to the merits of the ongoing investigation exception, the court found that the general assertions in Lieutenant McGrath's certification were insufficient to justify withholding the records because defendants failed to demonstrate that disclosure would be "inimical to the public interest."  The court also found that defendants "failed to meet their burden to justify denying NJMG access to reports" about the circumstances of the arrest and the personnel involved, citing N.J.S.A. 47:1A-3(b).

In addition, the court concluded that the criminal investigatory records exception, N.J.S.A. 47:1A-1.1, was inapplicable because defendants did not prove that the records were "not required by law to be made."  The court also declined defendants' motion to seal a second certification from Lieutenant McGrath.  Finally, the court balanced the relevant

14

factors under the common law and found that NJMG's interest in disclosure outweighed defendants' concerns for confidentiality.[1]

In a separate order, the court directed defendants to release unredacted copies of records within three days in response to NJMG's OPRA requests. The Appellate Division granted the Attorney General's emergent motion for leave to appeal and stayed the trial court's order.

In a published opinion dated June 11, 2015, the Appellate Division reversed the order of disclosure and remanded for reconsideration. NJMG, supra, 441 N.J. Super. at 70, 118-19.

The panel looked to case law about the Right to Know Law (RTKL), which OPRA replaced, to interpret OPRA's criminal investigatory records exception. Id. at 95-100. The RTKL created a right of access only to government records "required by law to be made, maintained or kept on file." L. 1963, c. 73, § 1. The Appellate Division acknowledged that OPRA favors broader public access to government records than the RTKL, and that "the 'required by law' standard" had been "narrowly construed" under the earlier statute. NJMG, supra, 441 N.J. Super. at 97. The panel, though, applied pre-OPRA case law and

---

[1] Judge Doyne's January 2015 opinion noted that charges had been filed against Bynes and that the investigation into Bynes "is alleged to be ongoing." Bynes, however, had been released on bail and "was fatally shot in Newark in March 2015." NJMG, supra, 441 N.J. Super. at 85.

concluded that "a generic record retention policy, or an internal agency directive of a public official" would not "satisfy the 'required by law' standard with respect to criminal investigatory records." Ibid.

Next, the panel considered what documents "pertain" to a criminal investigation -- language that appears in both exceptions in question. The panel observed "that a document . . . created before an investigation starts . . . does not 'pertain' to an investigation at that point, [and] does not change its character once an investigation begins." Id. at 104. "On the other hand," the panel noted, "when an officer turns on a mobile video recorder to document a traffic stop or pursuit of a suspected criminal violation of law, that recording may pertain to a 'criminal investigation,' albeit in its earliest stages." Id. at 104-05. By contrast, routine documents that police prepare, like activity logs or CAD reports, do not "pertain" to an investigation. Id. at 105.

Applying those principles, the panel concluded that, aside from the 9-1-1 recording, motor vehicle accident reports, and portions of CAD records and other logs that do not relate to the criminal investigations, the requested documents fell within the criminal investigatory records exception. Id. at 105-07.

For the sake of completeness, the Appellate Division also reviewed OPRA's exception for ongoing investigations. The panel

16

noted that whether the release of documents would be "inimical to the public interest" under section 3(a) is a fact-sensitive issue. Id. at 108. As a result, the panel found that it was premature to reject the State's concerns about disclosure "absent review of Lt. McGrath's proposed ex parte, in camera submission." Id. at 110.

As to section 3(b) of the exemption, the panel held that the State may convey information in a press release. Id. at 112. In this case, though, the panel found the release was incomplete. Id. at 113. The panel identified certain facts that the State was required to disclose and directed it to release the information promptly or explain "to the trial court why it should be excused from doing so." Ibid.

The Appellate Division remanded to the trial court to reconsider NJMG's request under section 3(a) and the common law. Id. at 118. As part of that review, the panel directed the trial court to consider the proposed ex parte certification of Lieutenant McGrath and a Vaughn index, if necessary. Id. at 119.

In response to the ruling, the Attorney General sent NJMG a letter dated June 22, 2015, with additional information. It revealed that "[f]our law enforcement officers discharged a total of thirteen rounds toward Mr. Ashford," and it identified the types of weapons used and the number of rounds fired from

17

each.  The letter named three officers who arrested Bynes but withheld the names of the officers who discharged their weapons for "safety and security concerns" and because of the ongoing SRT investigation.[2]

On remand, the Honorable Bonnie J. Mizdol, A.J.S.C., considered Lieutenant McGrath's second certification, ex parte. Although the document appears in the record, it is under seal. In an opinion dated July 30, 2015, Judge Mizdol found the certification to be "cursory at best."  She observed that it "failed to categorize the types of records and proffer any specific justifications for their non-disclosure."  The court added that the document "simply gave the same generic reasoning" as the first certification.  As a result, the court ordered the Attorney General to produce a Vaughn index.  The Attorney General complied and also submitted a certification of Paul

---

[2]  The Attorney General also issued a Supplemental Directive on July 28, 2015, which outlined best practices for use of force investigations.  Attorney General, Supplemental Law Enforcement Directive Amending Attorney General Law Enforcement Directive No. 2006-5 (July 28, 2015) (Supplemental Directive).  Among other things, the new directive outlined a "comprehensive conflicts inquiry" to ensure the independence of SRT investigations.  Id. at 3.  The Supplemental Directive also requires that use of force investigations be presented to a grand jury unless "the undisputed facts indicate that the use of force was justifiable under the law."  Id. at 7.  If the grand jury declines to indict, or the matter is not presented, the revised directive calls for the release of a public statement. Id. at 9.

Morris, Chief of Detectives of the Division of Criminal Justice. We review his certification below.

After further briefing and oral argument, Judge Mizdol ruled on September 14, 2015 that defendants were not required to release the names of the officers who fired at Ashford or investigated the shooting. The trial court also declined to require defendants to disclose two remaining UFRs, three dash-cam videos, and three police reports. The court relied heavily on the need to maintain the integrity of the ongoing investigation. Finally, the court denied NJMG's request for access under the common law.

Soon after, the Attorney General issued a press release that announced the state grand jury had voted not to file criminal charges against the four officers who fired at Ashford. Press Release, Attorney General, State Grand Jury Returns "No Bill" in Fatal Police-Involved Shooting in Rutherford Last Year Following Vehicular Pursuit of Stolen Car (Sept. 23, 2015). The release outlined details of the incident and revealed that four officers discharged their weapons. Two Lyndhurst officers shot and struck Ashford; a Rutherford officer and a State Police trooper fired at Ashford but did not hit him. Ibid. The release did not identify those officers by name.[3]

---

[3] We note that the record before this Court includes copies of three redacted UFRs. None of them are from the Lyndhurst Police

19

We granted defendants' motion for leave to appeal. 223 N.J. 553 (2015). We also relaxed the Court Rules to consider the September 14, 2015 judgment the Law Division entered on remand.

IV.

A.

NJMG argues that the Appellate Division erred in its interpretation of OPRA. NJMG contends that the criminal investigatory records exception must be construed narrowly in favor of public access. To interpret the "required by law" standard in the exception, NJMG maintains that it is inappropriate to rely on pre-OPRA case law that reviewed a more restrictive RTKL. NJMG contends that Attorney General Directives satisfy the current standard. NJMG also argues that the Appellate Division misconstrued the phrase "pertain to an investigation," which appears in both the criminal investigatory records exception and section 3(a). According to NJMG, the language does not encompass records about the apprehension of a suspect.

As to OPRA's exemption for ongoing investigations, NJMG asserts that the Legislature did not bestow unreviewable

_____

Department. NJMG claims that UFRs for the two Lyndhurst officers who fired their weapons remain unaccounted for.

20

discretion on the State to withhold records. In addition, NJMG contends that an agency must show more than a purely speculative risk of harm to justify non-disclosure. NJMG also claims that defendants cannot satisfy section 3(b)'s disclosure requirement with a press release.

Finally, NJMG argues that the Law Division did not conduct the proper inquiry under the common law on remand.

B.

Defendants claim that the Appellate Division correctly interpreted OPRA's criminal investigatory records exception consistent with identical language in the RTKL, OPRA's predecessor. According to defendants, a directive from the Attorney General does not satisfy the "required by law" standard. Defendants also contend that records about the pursuit or arrest of a suspect can "pertain" to a criminal investigation and be protected under both the criminal investigatory records and ongoing investigation exceptions.

Defendants argue that section 3(b) does not require disclosure of the "names" of the officers involved in a shooting incident and, in any event, allows law enforcement to withhold that information under circumstances that apply here. Defendants also maintain that section 3(b) requires the release of information, not records.

In addition, defendants argue that NJMG could not clear the steep hurdle that exists under the common law when a requester seeks records relating to an ongoing criminal investigation.

C.

We granted amicus curiae status to several groups.  A number of them support NJMG's position and echo its arguments. The Reporters Committee for Freedom of the Press, American Civil Liberties Union of New Jersey, New Jersey Press Association, and sixteen additional organizations[4] submitted a single brief to stress "the importance of interpreting OPRA in a manner that ensures the press and the public meaningful access to law enforcement records."  They point to "recent incidents across the country," many of which involved "unarmed minorities," which strengthen the "overwhelming public interest in access to records involving police officers' use of deadly force."

The New Jersey Foundation for Open Government and Police Accountability Project of New Jersey Libertarian Party together contend that "records of stops, pursuits, shootings and arrests

---

[4]  The sixteen entities are Advance Publications, Inc., American Society of News Editors, Associated Press, Association of Alternative Newsmedia, First Look Media, Inc., Gannett Co., Inc., Investigative Reporting Workshop at American University, MPA - The Association of Magazine Media, National Association of Black Journalists, National Newspaper Association, National Press Club, National Press Photographers Association, The New York Times Company, Online News Association, Society of Professional Journalists, and the Tully Center for Free Speech.

are not, in and of themselves," covered by the two OPRA exceptions in question.

The American Civil Liberties Union of New Jersey, Association of Black Women Lawyers of New Jersey, Black Lives Matter – NJ, Garden State Bar Association, Garden State Equality, Latino Action Network, Latino Leadership Alliance, LatinoJustice PRLDEF, and the People's Organization for Progress also submitted a single brief as amicus. They claim that the Appellate Division's ruling "ignores the Legislature's mandate that OPRA be broadly construed" and urge the Court to reverse the ruling. They note, in particular, that public access to video footage is important because of video's unique capacity to document and convey information.

The State Troopers Fraternal Association and Bergen County Policemen's Benevolent Association Conference together address the privacy, health, and safety interests that should be considered under OPRA's exceptions before the release of any records. They note that the use of deadly force that results in a civilian fatality "represents an extraordinary event" that "requires special consideration." Among other arguments, the groups urge that law enforcement officers be notified before "any potential release of documents."

\*    \*    \*    \*    \*

23

We have had the benefit of fine presentations by able counsel in this case, but the record is somewhat limited. It is not clear precisely which documents have been disclosed, which requests remain outstanding, and which of those are pressed on appeal. We therefore focus on what we perceive to be the key questions that require attention in this interlocutory appeal: the scope of the criminal investigatory records exception in cases that involve a police shooting under investigation by the SRT; the meaning and scope of the ongoing investigations exemption in those matters; and the application of the common law balancing test to this challenging area. We discuss each in turn.

V.

We begin with OPRA's criminal investigatory records exception. Once again, to qualify for the exception -- and be exempt from disclosure -- a record (1) must not be "required by law to be made," and (2) must "pertain[] to a criminal investigation." N.J.S.A. 47:1A-1.1. We consider UFRs and certain other items under that standard. We find that the criminal investigatory records exception does not apply to UFRs because defendants cannot satisfy the test's first prong. Specifically, defendants cannot show that the records requested were "not required by law to be made." N.J.S.A. 47:1A-1.1. Certain other outstanding records are covered by the exception.

24

## A. Criminal Investigatory Records Exception – Use of Force Reports

The Attorney General is the State's chief law enforcement officer and has the authority to adopt guidelines, directives, and policies that bind police departments throughout the State. See O'Shea, supra, 410 N.J. Super. at 382 (citing N.J.S.A. 52:17B-97 to -117); see also Doe v. Poritz, 142 N.J. 1, 23 (1995). In 1985, and again in 2000, different Attorneys General issued and revised the Use of Force Policy that still applies to state and local law enforcement officers. Use of Force Policy, supra. The policy requires that "[i]n all instances when physical, mechanical, or deadly force is used, each officer who has employed such force shall complete" a "Use of Force Report" and "[a]ny reports made necessary by the nature of the underlying incident." Id. at 7.

The policy is not a generic set of rules about record retention; it is a clear, pointed statement of policy from the chief law enforcement official to all officers who have used deadly force. We therefore agree with the Appellate Division's analysis in O'Shea, supra, that the Use of Force Policy has "the force of law for police entities." 410 N.J. Super. at 382. And because Use of Force Reports are "required by law to be made," they cannot be exempt from disclosure under OPRA's criminal investigatory records exemption. N.J.S.A. 47:1A-1.1.

25

To reach that conclusion, we do not rely on the "required by law" standard in the Right to Know Law, OPRA's predecessor. The prior law permitted access to "public records" but used a narrow definition for the term, namely, those records "required by law to be made, maintained or kept on file" by a public body. N.J.S.A. 47:1A-2 (repealed by OPRA, L. 2001, c. 404, § 17). Because that phrase mirrors language in the criminal investigatory records exception, the Appellate Division relied on pre-OPRA case law to interpret OPRA's use of "required by law." NJMG, supra, 441 N.J. Super. at 92-97.

Under the old law, the Court consistently held that the definition of a public record was "narrow and [was] to be strictly construed." Keddie v. Rutgers, 148 N.J. 36, 46 (1997). But this is not a situation in which the Legislature simply imported language from one statute to another to preserve an existing judicial interpretation. See Lemke v. Bailey, 41 N.J. 295, 301 (1963). To the contrary, OPRA replaced and significantly expanded upon the RTKL. Compare L. 1963, c. 73, with L. 2001, c. 404. See also Paff v. Galloway Township, ___ N.J. ___, ___ (2017) (slip op. at 14-15). When it enacted OPRA, the Legislature replaced the RTKL's more restrictive view of public access with the current, far broader approach.

We therefore interpret OPRA's criminal investigatory records exemption in light of the current law's stated purpose,

26

which favors broad access, and not prior case law that analyzed the narrower RTKL. See O'Shea, supra, 410 N.J. Super. at 381. We do not accept that the Legislature used the phrase "required by law" in OPRA "to broaden the scope of documents concealed from public view." Paff v. Ocean Cty. Prosecutor's Office, 446 N.J. Super. 163, 183 (App. Div.), certif. granted, 228 N.J. 403 (2016).

Our conclusion reflects the nature of investigations that must follow a law enforcement officer's use of deadly force. Prosecutors typically have discretion about whether to investigate allegations that a crime has occurred. When they conduct an investigation in such instances, the criminal investigatory records exception has broader application. After a fatal police shooting, though, each officer involved is required to file a UFR, and an investigation must be conducted -- all in accordance with the directives and policies of the Attorney General.

B. Criminal Investigatory Records Exception - MVR Recordings

It appears from the Vaughn index that three dash-cam videos have not been disclosed. Our analysis of those items is limited by the extent of the record.

No one has pointed to an Attorney General directive relating to the use of dashboard cameras. We cannot tell from

27

the record if the officers in this case turned on their dash-cameras in an exercise of discretion or in response to an order at the local level.  We also do not know whether the recording devices turned on automatically.

A divided Appellate Division panel recently wrestled with this challenging area in Paff, supra.  The majority found that the MVR recordings in question were "required by law to be made."  446 N.J. Super. at 185.  The majority relied on a local police chief's general order to use MVRs to protect officers and enhance training.  Id. at 171.  Under the chief's policy, MVRs automatically began recording when a "patrol vehicle's emergency lights [were] activated or the wireless microphone [was] turned on."  Ibid.  The majority likened the local police chief's policy to the Attorney General's directive in O'Shea and found that it was a binding, enforceable policy -- "the equivalent of a record required by law."  Id. at 185 (citing delegation of power provided by N.J.S.A. 40A:14-118).

The dissent observed that

> [t]o hold that an order issued by a municipal chief of police makes a document required by law would, by logical extension, effectively eliminate the criminal investigatory records exemption.  Applying the majority's reasoning, any time there is a written directive calling for a document to be created in a police department that document would be required by law to be made and, thus would not come within the ambit of "criminal investigatory records." It is hard to imagine that there are any

28

> criminal investigatory documents created in a police department for which there is not an order, directive or instruction calling for that document to be prepared.
>
> [Id. at 199 (Gilson, J., dissenting).]

Because we do not know whether the officers in this case acted pursuant to any local directives, the intriguing issue raised in Paff is not before the Court here.[5]  NJMG instead points to general retention schedules generated to implement the Destruction of Public Records Law (DPRL), N.J.S.A. 47:3-15 to -32, and contends they satisfy the "required by law" standard.  Proposed record retention schedules are approved by the State Records Committee, an administrative agency the Legislature created under the DPRL.  See N.J. Land Title Ass'n v. State Records Comm., 315 N.J. Super. 17, 19 (App. Div. 1998).  NJMG points to various retention requirements for police records in support of its position.

The retention of public records serves valuable purposes.  In criminal and quasi-criminal matters, retention schedules benefit defendants and victims, who may need access to records long after an incident.  Not surprisingly, the schedules are quite comprehensive.  See Division of Archives and Records Management, Municipal Police Departments:  Records Retention and

---

[5]  The Court granted certification in Paff on November 29, 2016.  228 N.J. 403 (2016).  The Ocean County Prosecutor's Office also appealed as of right.

29

Disposition Schedule, http://www.state.nj.gov/treasury/revenue/ rms/pdf/m9000000.pdf. No reported decision, however, has found that retention schedules carry the force of law under OPRA or the RTKL. If that were the case, the RTKL's narrow definition of public records would have been anything but narrow. And because many records that pertain to criminal investigations must be retained, the criminal investigatory records exception would have little meaning. See NJMG, supra, 441 N.J. Super. at 107. We are unable to conclude that the Legislature intended those results and do not find that the retention schedules adopted by the State Records Committee meet the "required by law" standard for purposes of OPRA.

To be exempt from disclosure, a record must also "pertain[] to any criminal investigation." N.J.S.A. 47:1A-1.1. To "pertain" means "to have some connection with or relation to something." Webster's Third New International Dictionary, 1688 (3d ed. 1981).

The Appellate Division highlighted that some police records relate to an officer's community-caretaking function; others to the investigation of a crime. NJMG, supra, 441 N.J. Super. at 105. Only the latter are covered by the OPRA exception, which thus calls for a case-by-case analysis. The panel also correctly noted that "when an officer turns on a mobile video recorder to document a traffic stop or pursuit of a suspected

30

criminal violation of law, that recording may pertain to a 'criminal investigation,' albeit in its earliest stages." NJMG, supra, 441 N.J. Super. at 104-05.

We do not suggest that a dash-cam recording of a routine traffic stop, in which a suspect obeyed the police and pulled over, would necessarily "pertain" to a criminal investigation. That question is not before the Court. Here, however, multiple patrol cars pursued Ashford as he attempted to elude them in violation of the law. The actions of the police -- who tried to stop and arrest two suspects, and responded to resistance -- all pertained to an investigation into actual or potential violations of criminal law. The dash-cam recordings also pertained to the SRT investigation into Ashford's fatal shooting, which was later presented to a grand jury. Id. at 106. The same principles apply to detailed investigative reports and witness statements about the incident. The records therefore fall within the criminal investigatory records exception.

We note that this OPRA exception, unlike the exemption for ongoing investigations discussed below, does not consider whether disclosure would "be inimical to the public interest." N.J.S.A. 47:1A-3(a).[6]

---

[6] Because defendants produced the CAD report that existed, we do not consider whether CAD reports may be exempt from disclosure

31

VI.

We turn now to OPRA's exception for ongoing investigations, N.J.S.A. 47:1A-3, on which defendants also rely. We begin our discussion with the disclosures called for under section 3(b), which took place first in this case.

A.   Section 3(b)

Section 3(b) requires the release of specific information about a criminal investigation "within 24 hours or as soon as practicable, of a request." Among other categories, "information as to the identity of the investigating and arresting personnel" must be disclosed. N.J.S.A. 47:1A-3(b).

In a letter to NJMG dated June 22, 2015, defendants identified the names of the officers who arrested and charged Bynes. The letter "withheld" the names "of the officers who discharged their weapons . . . due to safety and security concerns" and the ongoing SRT investigation at the time.

As a threshold matter, the State's brief argues that section 3(b) does not require the disclosure of "names" of officers involved in shooting incidents; only their "identity" is required. We do not agree.

To understand the meaning of a statute, judges read words and phrases in their context and apply their "generally accepted

---

under OPRA. We discuss investigative reports and related items further in section VI.B.1.

meaning." N.J.S.A. 1:1-1; see also DiProspero, supra, 183 N.J. at 492 (reading statutory words "in context with related provisions so as to give sense to the legislation as a whole").

Section 3(b) uses "name" and "identity" interchangeably. For example, the statute calls for disclosure of the "name, address, and age of any victims," subject to particular exceptions. N.J.S.A. 47:1A-3(b) (emphasis added). The statute goes on to note that, "[i]n deciding on the release of information as to the identity of a victim, the safety of the victim and victim's family, and the integrity of any ongoing investigation, shall be considered." Ibid. (emphasis added). The statute also provides for the release of "the identity of the complaining party" unless otherwise exempt. Ibid. (emphasis added).

Read in context, the meaning of "identity" is plain: it refers to the names of the investigating and arresting officers as well as other identifying information, like an officer's rank and badge number. To distinguish between an officer who "shoots" and one who "arrests" makes little sense. See Tennessee v. Garner, 471 U.S. 1, 7, 105 S. Ct. 1694, 1699, 85 L. Ed. 2d 1, 7 (1985) (noting that "apprehension by the use of deadly force is a seizure").

The Attorney General presented additional reasons to justify withholding information in certifications from Paul

33

Morris and Robert McGrath.  Both serve in leadership positions at the Division of Criminal Justice.  Paul Morris is the Chief of Detectives; Lieutenant McGrath has been part of the Attorney General's Shooting Response Team for more than a decade.

Chief Morris's certification focuses on why defendants need not identify by name the officers who discharged their weapons. He submits that an officer involved in a shooting whose actions are ultimately "deemed justified . . . should not have his or her name released"; that the "stigma of even being associated with a law enforcement investigation is palpable, . . . potentially devastating," and "not so easily removed" even if "no charges are substantiated"; that the officers would face extensive media coverage with real consequences to them, their families, and the agencies they serve; that the officers and their families would face the "risk of retaliation"; and that disclosure "would greatly prejudice" the integrity of "the ongoing SRT investigation."  Chief Morris submits that only the names of officers whom a grand jury chooses to charge should be disclosed.

The carefully detailed reasons Chief Morris outlines apply to nearly all cases in which a law enforcement officer uses deadly force.  If accepted by the Legislature, the arguments could lead to a change in the current law.  But we are required to interpret the existing statute as written.  The law calls for

34

disclosure of "the identity of the investigating and arresting personnel" and adds that the exception on which defendants rely "shall be narrowly construed."  N.J.S.A. 47:1A-3(b).  Although section 3(b) does not require the State to demonstrate an actual threat against an officer, generic reasons alone cannot satisfy the statutory test.  A more particularized showing is required.

To meet the statutory requirements, OPRA requires the State to show that disclosure of the identity of an officer involved in an arrest or investigation "will jeopardize the safety of any person . . . or any investigation in progress" or "would be harmful to a bona fide law enforcement purpose or the public safety."  Ibid.  The certifications here did not demonstrate how the release of the officers' names would lead to either result.

OPRA adds that "[w]henever a law enforcement official determines that it is necessary to withhold information, the official shall issue a brief statement explaining the decision." Ibid.  That language, though, does not grant law enforcement agencies sole discretion to withhold information.  Here, although defendants offered a brief explanation, their reasons did not satisfy the standards set forth in section 3(b).

We note as well that section 3(b) allows some flexibility as to when an agency must respond to requests for information: "within 24 hours or as soon as practicable, of a request." N.J.S.A. 47:1A-3(b) (emphasis added).

35

Finally, the parties disagree about whether a public agency can satisfy section 3(b)'s disclosure requirement with a press release. NJMG contends that an agency must disclose actual records and cannot rely on a release.

The statute does not specify <u>how</u> information should be made available to the public. The text simply requires disclosure of "information"; it does not require an agency to release "records." Based on the plain language of section 3(b), we cannot conclude that the Legislature meant to bar an agency from using a press release under the tight timeframe the law imposes. See <u>NJMG</u>, <u>supra</u>, 441 <u>N.J. Super.</u> at 112.

### B. <u>Section 3(a)</u>

Section 3(a) of the ongoing investigation exception applies to other requests for information in this appeal. To avail itself of the exemption, a public agency must show that (1) the requested records "pertain to an investigation in progress by any public agency," (2) disclosure will "be inimical to the public interest," and (3) the records were not available to the public before the investigation began. <u>N.J.S.A.</u> 47:1A-3(a).

Few reported decisions have analyzed the exception. In <u>Serrano v. South Brunswick Township</u>, 358 <u>N.J. Super.</u> 352, 367 (App. Div. 2003), the Appellate Division rejected a claim that the release of a 9-1-1 tape could make it difficult to impanel a jury in a murder case and might call for a change of venue.

36

Even if that were to happen, the panel observed, the "inconveniences to the prosecutor" did not make disclosure "inimical to the public interest." Ibid. The panel also initially noted that the tape "was created hours before the police investigation began" and was "open for public inspection" at that time. Id. at 366 (quoting N.J.S.A. 47:1A-3(a)). Section 3(a) expressly carves that type of record out of the ongoing investigations exception.

The Appellate Division rejected similar arguments in Courier News v. Hunterdon County Prosecutor's Office, 358 N.J. Super. 373, 383 (App. Div. 2003), when it ordered the release of a 9-1-1 tape tied to a homicide investigation. In that case, the defendant claimed that release of the tape to the media would be "inimical to the public interest" for two reasons: it would be more difficult to "select[] an impartial jury" and would "likely cause juror confusion" when the jury heard an electronically enhanced tape at trial. Id. at 380. In its ruling, the panel highlighted various ways to guard against the first concern, id. at 382, and found that speculative fears of jury confusion did not meet section 3(a)'s burden of proof, id. at 383.

More recently, in Paff, supra, the Appellate Division briefly addressed section 3(a). In light of the facts of the case, which are discussed above, a majority of the panel found

37

that the MVR recordings preceded any investigation and that their release would not be inimical to the public interest. 446 N.J. Super. at 189-90.

With those cases in mind, we consider whether defendants have satisfied the statutory burden under section 3(a) -- whether they have shown that disclosure will "be inimical to the public interest."

As recent events across the nation make clear, shootings that involve law enforcement officers generate widespread interest -- when an officer, a civilian, or both are harmed. In such matters, "the public interest" encompasses various strands. Officer safety is always a vital concern. The need for a prompt, thorough, and reliable investigation is likewise important. And the need for transparency, which OPRA is designed to foster, also weighs heavily, particularly when law enforcement uses its most awesome authority -- deadly force. Courts must balance those interests to assess whether disclosure would be inimical to the overall public interest. We evaluate different categories of information in this case in light of those concerns.

1. Investigative Reports and Witness Statements

Investigative reports prepared after a police shooting ordinarily contain factual details and narrative descriptions of the event. Among other things, the reports may summarize

38

witness statements, detail an officer's role in an incident, and reveal preliminary forensic information. If made public and read by witnesses to the incident, detailed reports could taint a witness's memory and infect the reliability of an investigation. As a result, the danger to an ongoing investigation would typically weigh against disclosure of reports while the investigation is underway, particularly in its early stages. Early disclosure will often be "inimical to the public interest." N.J.S.A. 47:1A-3.

Section 3(a) does not contain a time limit for ongoing investigations, and no fixed limit would apply to all cases. In part of Lieutenant McGrath's second certification, he addresses general risks of corrupting a witness's memory. Although he submits that the risk of taint remains until a witness testifies at trial, he acknowledges that the risk is greatest in the first days and weeks after an incident -- before potential eyewitnesses are identified and interviewed.

We note that SRT investigations cannot continue indefinitely and invoke the protection of section 3(a). The risk of taint partly fades once the principal witnesses to an incident have made statements to law enforcement. After their statements are preserved, prosecutors and defense counsel can probe inconsistencies at trial under N.J.R.E. 613 and 803(a). As a result, although it may be appropriate to deny a request

39

for investigative reports under section 3(a) early in an investigation -- as in this case -- the outcome might be different later in the process.[7]  Indeed, depending on the circumstances, section 3(a) may not justify withholding reports after a grand jury votes not to file charges.  See NJMG, supra, 441 N.J. Super. at 118; see also Daily Journal v. Police Dep't, 351 N.J. Super. 110, 127-31 (App Div. 2002) (interpreting common law right of access).

In this case, the incident took place on September 16, 2014, and the grand jury acted more than one year later, on September 23, 2015.  The Attorney General concedes that "the investigation and grand jury presentment [took] longer than it should have"; the office also represents that other more recent SRT investigations "have occurred more quickly."

There is a strong public interest to expedite SRT investigations.  They raise serious questions that should be addressed promptly to maintain public confidence in the criminal justice system.

### 2.  Dash-cam videos

Dash-cam videos, or MVR recordings, raise somewhat different concerns.  The recordings, made while an event

---

[7]  A separate analysis would be necessary under the criminal investigatory records exception.  N.J.S.A. 47:1A-1.1.

unfolds, protect the public and police alike in that the videos can expose misconduct and debunk false accusations.

In many instances, section 3(a) will not apply to MVR recordings because they either do not "pertain to an investigation in progress" or were "open for public inspection . . . before the investigation commenced." N.J.S.A. 47:1A-3(a). Other cases will call for a fact-specific analysis of how the statutory standard applies.

Here, as well, to invoke the ongoing investigations exception, the State must show that disclosure would be "inimical to the public interest." Ibid. The same issues about officer safety, the reliability of ongoing investigations, and transparency are pertinent to this inquiry.

As to officer safety, the principles underlying section 3(b) remain relevant. Although a particularized threat is not required, the State must present more than generic allegations about safety.

As to the integrity of an ongoing investigation, courts must consider the particular reasons for non-disclosure in a given matter. Among a number of relevant factors are the nature of the details to be revealed, how extensive they are, and how they might interfere with an investigation. The fact that a video depicts a fatal shooting does not by itself establish that disclosure would undermine the reliability of an investigation.

41

As noted earlier, a key consideration is whether investigators have interviewed the available, principal witnesses to the incident -- namely, the witnesses on the scene who saw the shooting and are willing to speak with law enforcement. In a routine case, officers typically conduct those interviews and take statements within days of an incident, well before a grand jury presentation or possible trial.

The public's interest in transparency favors disclosure under section 3(a) in matters of great public concern. Ready access to government records lies at the heart of OPRA. And in the case of a police shooting, non-disclosure of dash-cam videos can undermine confidence in law enforcement and the work that officers routinely perform. It can also fuel the perception that information is being concealed -- a concern that is enhanced when law enforcement officials occasionally reveal footage that exculpates officers.[8]

In this case, defendants did not make a particularized showing under section 3(a) that disclosure of the MVR recordings after the incident would have jeopardized officer safety or the reliability and effectiveness of an ongoing investigation. Defendants did not assert that the essential witnesses to the

---

[8] Videos taken by members of the public, which sometimes surface after shooting incidents, are of course not subject to OPRA or other restrictions.

shooting had not been interviewed.  Also, the public's interest in disclosure was strong.  In other words, disclosure would not have been "inimical to the public interest."

We recognize, however, that disclosure was not required in this matter in light of the criminal investigatory records exception.  We reviewed the meaning of section 3 nonetheless to offer guidance in related areas, including the section that follows.

### 3.  Use of Force Reports

Under the above principles, we find that section 3(a) did not justify withholding or redacting Use of Force Reports.  UFRs contain relatively limited information.  A model UFR form is attached to the Attorney General's Policy.  Use of Force Policy, supra, at 10.  It calls for the names of the officer and the subject(s) along with basic demographic information.  Ibid.  The form also contains a checklist for the "subject's actions."  Ibid.  Beside each item are boxes to check off, such as "[r]esisted police officer control," "[t]hreatened/attacked officer or another with blunt object," "fired at officer or another," and "other (specify)."  Ibid.  Another checklist appears under "officer's use of force toward this subject," with boxes to check off for "[c]ompliance hold," "[h]ands/fists," "[s]trike/use baton or other object," "[f]irearms [d]ischarge"

43

-- "[i]ntentional" and "[a]ccidental" -- and a few other items.
Ibid.

Witness statements and investigative reports with narrative details reveal far more. Based on the nature of the form, the release of UFRs presents far less of a risk of taint to an ongoing investigation. Also, as noted earlier, defendants in this case raised only general safety concerns. Under the circumstances, defendants did not demonstrate that disclosure of UFRs was inimical to the public interest, and the records should have been released without redactions.[9]

## VII.

NJMG also sought access to records in this case under the common law. Although similar considerations arise under both OPRA and the common law -- especially concerns about the public interest under section 3(a) -- OPRA does not compel the outcome under the common law test. In fact, the Legislature expressly stated that "[n]othing contained in [OPRA] . . . shall be construed as limiting the common law right of access to a government record, including criminal investigatory records of a law enforcement agency." N.J.S.A. 47:1A-8; see also N.J.S.A. 47:1A-1.

_____

[9]  In response to amicus's argument, police departments can certainly notify officers before they release any UFR.

44

To constitute a common law public record, the item must be "a written memorial[] . . . made by a public officer, and . . . the officer [must] be authorized by law to make it." Nero v. Hyland, 76 N.J. 213, 222 (1978) (quoting Josefowicz v. Porter, 32 N.J. Super. 585, 591 (App. Div. 1954)). Defendants do not dispute that the items requested are public records.

To gain access to this broader class of materials, the requestor must make a greater showing than OPRA requires: "(1) 'the person seeking access must establish an interest in the subject matter of the material'; and (2) 'the citizen's right to access must be balanced against the State's interest in preventing disclosure.'" Mason, supra, 196 N.J. at 67-68 (quoting Keddie, supra, 148 N.J. at 50 (internal quotation marks omitted)).

This Court's ruling in Loigman v. Kimmelman, 102 N.J. 98, 113 (1986), identified a number of factors to consider in the balancing process. They are not all relevant in the context of a police shooting. We consider a number of the core concerns that also arise under section 3(a) to address the most pertinent question: how to balance NJMG's interest in the records against defendants' need for confidentiality.

Defendants stress the need for confidentiality to protect the integrity of a criminal investigation. In that regard, the State and the public have an interest in thorough and reliable

45

investigations that are untainted by the early disclosure of investigative details.  See NJMG, supra, 441 N.J. Super. at 117; see also Loigman, supra, 102 N.J. at 107-08 (recognizing "vital public interest in . . . the success of criminal prosecutions and the protection of potential witnesses and informants").  Without question, it is preferable to shield potential witnesses from other accounts as a general rule.

NJMG asserts other compelling interests.  To begin with, it is not a private citizen seeking to correct a private harm; in its role as a media organization, NJMG "seeks access to information to further a public good."  Loigman, supra, 102 N.J. at 104; see also S. Jersey Pub. Co. v. N.J. Expressway Auth., 124 N.J. 478, 487 (1991) (noting "newspaper's interest in 'keep[ing] a watchful eye on the workings of public agencies'" (alteration in original) (quoting Red Bank Register v. Bd. of Educ., 206 N.J. Super. 1, 9 (App. Div. 1985))).  NJMG, thus, had an interest to inspect the public records it sought.

NJMG requested materials that may shed light on "the possible use of excessive force by police" -- an area of "intense public interest."  NJMG, supra, 441 N.J. Super. at 117.  The same evidence may also reassure the public that the police acted professionally and lawfully -- another legitimate public interest.  In either event, the public's interest in

46

transparency is heightened when governmental action leads to the death of a civilian.

To conduct the careful balancing that each case -- and this sensitive area -- require, we look in particular at the level of detail contained in the materials requested.  More detailed disclosures, of course, present a greater risk of taint to an investigation.  With that in mind, we find that the Attorney General's interest in the integrity of investigations is strongest when it comes to the disclosure of investigative reports, witness statements, and other comparably detailed documents.  In those areas, the State's interest outweighs NJMG's.[10]

The balance can tip in favor of disclosure, however, for materials that do not contain narrative summaries and are less revealing.  Footage of an incident captured by a police dashboard camera, for example, can inform the public's strong interest in a police shooting that killed a civilian.  It can do so in a typical case without placing potential witnesses and informants at risk.  Dash-cam footage can also be released without undermining the integrity of an investigation once

---

[10]  The timing of a request may affect the balancing process.  As the Appellate Division aptly noted, "the need for confidentiality in investigative materials may wane after the investigation is concluded."  NJMG, supra, 441 N.J. Super. at 115; see also Shuttleworth v. City of Camden, 258 N.J. Super. 573, 585 (App. Div. 1992).  Cf. Keddie, supra, 148 N.J. at 54.

47

investigators, shortly after an incident, have interviewed the principal witnesses who observed the shooting and are willing to speak to law enforcement.  Based on our in camera review of the certifications the State submitted in this case, we note that the State advanced only generic safety concerns.

Under the circumstances of this case, we find that the public's substantial interest in disclosure of MVR recordings, which NJMG's requests fostered, warranted the release of those materials under the common law right of access.  To the extent that a viewer might incorrectly assume certain things from an MVR recording, as the State suggests, it may supplement the videos with facts that offer appropriate context.

## VIII.

Both sides have raised thoughtful policy concerns in this appeal about the importance of officer safety and transparency, which do not always align.  When the Legislature drafted OPRA, it made certain policy choices about those issues.  It may of course revisit those difficult questions.  Our responsibility, however, is to follow the law as written.

For the reasons stated above, we find that NJMG was entitled to disclosure of unredacted Use of Force Reports, under OPRA, and dash-cam recordings of the incident, under the common law.  Investigative reports, witness statements, and similarly

48

detailed records were not subject to disclosure at the outset of the investigation, when they were requested.

We therefore affirm in part and reverse in part the judgment of the Appellate Division.


JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in CHIEF JUSTICE RABNER's opinion.